# *United States v. Durham*
# No. 21-4416

<u>Appendix to Memorandum Brief</u>

<u>Contents</u>                                                              <u>Page No.</u>

Docket Sheet ................................................................................................App. 1

Indictment ...................................................................................................App. 6

Transcript of Initial Appearance (July 1, 2021).........................................App. 9

Transcript of Detention Hearing Waiver (July 7, 2021) .........................App. 28

Emergency Motion for Release ................................................................App. 33

Government's Response to Emergency Motion for Release.................App. 47

Transcript of District Court Hearing (August 2, 2021) .........................App. 58

District Court Order ................................................................................App. 94

Notice of Interlocutory Appeal .............................................................App. 96

APPEAL,Exhibits,USMJ Jones

## U.S. District Court
## EASTERN DISTRICT OF NORTH CAROLINA (Western Division)
## CRIMINAL DOCKET FOR CASE #: 5:21–cr–00229–D All Defendants

Case title: USA v. Durham                              Date Filed: 06/03/2021

Assigned to: District Judge James
C. Dever, III

Appeals court case number:
21–4416 4CCA

**Defendant (1)**

| | | |
|---|---|---|
| **Frankie Allan Durham** | represented by | **David E. Wicclair** |
| | | Federal Public Defender – EDNC |
| | | 150 Fayetteville Street Mall, Suite 450 |
| | | Raleigh, NC 27601 |
| | | 919–856–4236 |
| | | Fax: 919–856–4477 |
| | | Email: david_wicclair@fd.org |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | *Designation: Public Defender or Community Defender Appointment* |

| **Pending Counts** | **Disposition** |
|---|---|
| Possession of a Firearm by a Convicted Felon (1) | |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
|---|---|
| None | |

**Plaintiff**

| | | |
|---|---|---|
| **USA** | represented by | **Aakash Singh** |
| | | United States Attorney's Office – EDNC |
| | | 150 Fayetteville Street, Suite 2100 |
| | | Raleigh, NC 27601 |
| | | 919–856–4092 |
| | | Email: aakash.singh@usdoj.gov |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Robert J. Dodson** |

United States Attorney's Office – EDNC
150 Fayetteville Street, Suite 2100
Raleigh, NC 27601
919–856–4054
Fax: 919–856–4487
Email: robert.dodson@usdoj.gov
*TERMINATED: 08/03/2021*
*LEAD ATTORNEY*
*Designation: Assistant US Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/03/2021 | 1 | INDICTMENT as to Frankie Allan Durham (1) count 1. The foreperson's signature has been redacted pursuant to the E–Government Act. The unredacted version of this document has been filed under seal. (Brewer, C) (Entered: 06/07/2021) |
| 06/03/2021 | 2 | Unredacted Document 1 Indictment (Brewer, C) (Entered: 06/07/2021) |
| 06/03/2021 | 3 | Warrant Requested by USA as to Frankie Allan Durham. (Brewer, C) (Entered: 06/07/2021) |
| 06/03/2021 | 4 | Arrest Warrant Issued by Peter A. Moore, Jr., Clerk of Court in case as to Frankie Allan Durham. Original to US Marshal's Office for service. (Brewer, C) (Entered: 06/07/2021) |
| 06/03/2021 | 5 | Penalty Sheet *(Selected Participants Only)* as to Frankie Allan Durham (Brewer, C) (Entered: 06/07/2021) |
| 06/30/2021 | | Set Hearing as to Frankie Allan Durham: Initial Appearance set for 7/1/2021 at 10:30 AM in Raleigh – 6th Floor Courtroom before Magistrate Judge James E. Gates. (Horton, B.) (Entered: 06/30/2021) |
| 06/30/2021 | | Arrest of Frankie Allan Durham. (Horton, B.) (Entered: 07/01/2021) |
| 07/01/2021 | 6 | CJA 23 Financial Affidavit by Frankie Allan Durham. (Horton, B.) (Entered: 07/01/2021) |
| 07/01/2021 | 7 | ORDER APPOINTING FEDERAL PUBLIC DEFENDER as to Frankie Allan Durham. Signed by Magistrate Judge James E. Gates on 7/1/2021. (Horton, B.) (Entered: 07/01/2021) |
| 07/01/2021 | | ORAL MOTION for Detention filed by USA as to Frankie Allan Durham. (Horton, B.) (Entered: 07/01/2021) |
| 07/01/2021 | | ORAL ORDER REGARDING DUE PROCESS PROTECTIONS ACT as to Frankie Allan Durham. Entered by Magistrate Judge James E. Gates on 7/1/2021. (Horton, B.) (Entered: 07/01/2021) |
| 07/01/2021 | 8 | ORDER REGARDING DUE PROCESS PROTECTIONS ACT as to Frankie Allan Durham. Signed by Magistrate Judge James E. Gates on 7/1/2021. (Horton, B.) (Entered: 07/01/2021) |
| 07/01/2021 | 9 | Minute Entry for proceedings held before Magistrate Judge James E. Gates in Raleigh.Initial Appearance as to Frankie Allan Durham held on 7/1/2021.Assistant U.S. Attorney present for government. Defendant requests counsel. Federal Public Defender appointed. Defendant advised of rights, charges, and maximum punishments. Government moves for detention. Detention Hearing set for 7/7/2021 at 10:30 AM in Raleigh – 6th Floor Courtroom before Magistrate Judge James E. Gates. The court confirmed to counsel for the government and for defendants both orally and in writing the disclosure obligation of the prosecution under Brady and its progeny and possible consequences of violation of the obligation under applicable law. Defendant remanded to the custody of the U.S. Marshal. (Court Reporter – FTR) (Horton, B.) (Entered: 07/01/2021) |
| 07/01/2021 | 10 | ORDER OF TEMPORARY DETENTION as to Frankie Allan Durham. Detention Hearing set for 7/7/2021 at 10:30 AM in Raleigh – 6th Floor Courtroom before Magistrate Judge James E. Gates. Signed by Magistrate Judge James E. Gates on 7/1/2021. (Horton, B.) (Entered: 07/01/2021) |

| | | |
|---|---|---|
| 07/02/2021 | 11 | Notice of Attorney Appearance: David E. Wicclair appearing for Frankie Allan Durham . (Wicclair, David) (Entered: 07/02/2021) |
| 07/02/2021 | 12 | SCHEDULING ORDER as to Frankie Allan Durham: Arraignment set for 8/23/2021 term in Raleigh – 7th Floor – Courtroom before District Judge James C. Dever III. The attorneys are ORDERED to conduct a pre–trial conference on or before July 19, 2021. Motions due by 8/2/2021. Response to Motion due by 8/16/2021. Counsel should read the order in its entirety for additional information. Signed by Magistrate Judge Robert B. Jones, Jr. on 7/2/2021. (Lopez, R.) (Entered: 07/02/2021) |
| 07/05/2021 | 13 | Request for discovery filed by Frankie Allan Durham . (Wicclair, David) (Entered: 07/05/2021) |
| 07/06/2021 | 14 | Arrest Warrant Returned Executed on 6/30/21 as to Frankie Allan Durham. (Roy, S.) (Entered: 07/06/2021) |
| 07/06/2021 | 15 | Pretrial Services Report filed by J. Chris Cagle as to Frankie Allan Durham. (Simonson, R.) (Entered: 07/06/2021) |
| 07/07/2021 | 16 | Minute Entry for proceedings held before Magistrate Judge James E. Gates in Raleigh.Detention Hearing as to Frankie Allan Durham held on 7/7/2021. Assistant U.S. Attorney present for government. Defendant present with counsel. The defendant waives his detention hearing. The court finds that the defendant knowingly and voluntarily provides his Waiver of Detention Hearing. The court accepts defendants waiver. The governments motion for detention is allowed. Defendant ordered detained and remanded to the custody of the U.S. Marshal. (Court Reporter – FTR) (Horton, B.) (Entered: 07/07/2021) |
| 07/07/2021 | 17 | Waiver of Detention Hearing by Frankie Allan Durham. (Horton, B.) (Entered: 07/07/2021) |
| 07/07/2021 | | ORAL ORDER granting Oral Motion for Detention Pending Trial as to Frankie Allan Durham (1). Entered by Magistrate Judge James E. Gates on 7/7/2021. (Horton, B.) (Entered: 07/07/2021) |
| 07/07/2021 | | TEXT ORDER as to Frankie Allan Durham: The court finds that the defendant has knowingly and voluntarily waived his detention hearing, and he is ordered detained pending trial. The defendant is remanded to the custody of the Attorney General or to the Attorney Generals designated representative for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal. The defendant must be afforded a reasonable opportunity for private consultation with defense counsel. On order of a court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility must deliver the defendant to a United States Marshal for the purpose of an appearance in connection with a court proceeding. Entered by Magistrate Judge James E. Gates on 7/7/2021. (Horton, B.) (Entered: 07/07/2021) |
| 07/29/2021 | 18 | MOTION for Release from Custody , MOTION to Stay *Transfer* filed by Frankie Allan Durham. (Attachments: # 1 Exhibit Email re Tallahatchie Transfer, # 2 Exhibit Letter of Acceptance to Healing Transitions) (Wicclair, David) (Entered: 07/29/2021) |
| 07/29/2021 | | Motion Submitted to District Judge James C. Dever III as to Frankie Allan Durham regarding 18 MOTION for Release from Custody MOTION to Stay *Transfer*. (Roy, S.) (Entered: 07/29/2021) |
| 07/29/2021 | | Set Hearing as to Motion as to Frankie Allan Durham 18 MOTION for Release from Custody MOTION to Stay *Transfer*. Motion Hearing set for 8/2/2021 at 11:30 AM in Raleigh – 7th Floor – Courtroom 1 before District Judge James C. Dever III. (Roy, S.) (Entered: 07/29/2021) |
| 07/30/2021 | 19 | RESPONSE in Opposition by USA as to Frankie Allan Durham regarding 18 MOTION for Release from Custody MOTION to Stay *Transfer* filed by USA as to Frankie Allan Durham. (Dodson, Robert) (Entered: 07/30/2021) |
| 08/02/2021 | 20 | Minute Entry for proceedings held before District Judge James C. Dever III in Raleigh. Defendant present with Counsel, Assistant U.S. Attorney present for the government. Motion Hearing as to Frankie Allan Durham held on 8/2/2021 regarding 18 MOTION for Release from Custody MOTION to Stay *Transfer* filed by Frankie Allan Durham. |

| | | |
|---|---|---|
| | | The court hears argument from both parties. Motion to Stay is deemed moot, Motion for Release from Custody is denied. Defendant remanded to the custody of the U.S. Marshal. (Court Reporter Michelle McGirr) (Roy, S.) (Entered: 08/02/2021) |
| 08/02/2021 | | ORAL ORDER denying 18 Motion for Release from Custody as to Frankie Allan Durham (1); finding as moot 18 Motion to Stay as to Frankie Allan Durham (1). Signed by District Judge James C. Dever III on 8/2/2021. (Roy, S.) (Entered: 08/02/2021) |
| 08/02/2021 | 21 | DEFENSE EXHIBIT LIST as to Frankie Allan Durham. (Roy, S.) (Entered: 08/02/2021) |
| 08/02/2021 | 22 | ORDER OF DETENTION PENDING TRIAL as to Frankie Allan Durham regarding Order on Motion for Release from Custody, Order on Motion to Stay. Follows oral order of 8/2/21.. Signed by District Judge James C. Dever III on 8/2/2021. (Roy, S.) (Entered: 08/02/2021) |
| 08/02/2021 | 23 | First MOTION for Extension of Time To File Pre–Trial Motions until 1 October 2021, First MOTION to Continue *Arraignment* filed by Frankie Allan Durham. (Attachments: # 1 Text of Proposed Order) (Wicclair, David) (Entered: 08/02/2021) |
| 08/03/2021 | | Motion Submitted to District Judge James C. Dever III as to Frankie Allan Durham regarding 23 First MOTION for Extension of Time To File Pre–Trial Motions until 1 October 2021First MOTION to Continue *Arraignment*. (Roy, S.) (Entered: 08/03/2021) |
| 08/03/2021 | 24 | Notice of Substitution of Counsel filed by Aakash Singh on behalf of USA substituting for Robert J. Dodson. (Singh, Aakash) (Entered: 08/03/2021) |
| 08/03/2021 | 25 | ORDER granting 23 Motion for Extension of Time to file pretrial motions and responses and granting 23 Motion to Continue Arraignment as to Frankie Allan Durham (1). Signed by District Judge James C. Dever III on 8/3/2021. (Roy, S.) (Entered: 08/03/2021) |
| 08/03/2021 | | Reset Hearing as to Frankie Allan Durham: Arraignment set for the 11/29/2021 term of court in Raleigh – 7th Floor – Courtroom 1 before District Judge James C. Dever III. (Roy, S.) (Entered: 08/03/2021) |
| 08/12/2021 | 26 | OFFICIAL TRANSCRIPT of Proceedings as to Frankie Allan Durham held on 7/1/2021, Initial Appearance, before Judge James E. Gates. Court Transcriber – Janice Russell, Telephone number 757–422–9089, trussell31@tdsmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Please review Attorney obligations regarding the redaction of electronic transcripts of court proceedings available on the court's website. Redaction Request due 9/5/2021. Redacted Transcript Deadline set for 9/15/2021. Release of Transcript Restriction set for 11/13/2021. (Foell, S.) (Entered: 08/12/2021) |
| 08/12/2021 | 27 | OFFICIAL TRANSCRIPT of Proceedings as to Frankie Allan Durham held on 7/7/2021, Detention Hearing, before Magistrate Judge James E. Gates. Court Transcriber/ Janice Russell, Telephone number 757–422–9089, trussell31@tdsmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Please review Attorney obligations regarding the redaction of electronic transcripts of court proceedings available on the court's website. Redaction Request due 9/5/2021. Redacted Transcript Deadline set for 9/15/2021. Release of Transcript Restriction set for 11/13/2021. (Foell, S.) (Entered: 08/12/2021) |
| 08/12/2021 | | Notice of Filing of Official Transcript 26 , 27 Transcript. The parties have seven calendar days from the filing of the transcript to file a Notice of Intent to Request Redaction. The parties must also serve a copy on the court reporter or transcriber. After filing the Notice of Intent to Request Redaction, a party must submit to the court reporter or transcriber, within 21 calendar days of the filing of the transcript, a written statement indicating where the personal data identifiers to be redacted appear in the transcript. (Foell, S.) (Entered: 08/12/2021) |

**DURHAM APPENDIX 5**

Case: 5:21-cr-00229   As of: 08/24/2021 07:48 AM EDT   5 of 5

| 08/16/2021 | 28 | Notice of Interlocutory Appeal filed by Frankie Allan Durham as to 22 Order – Written Order Following Oral Order on Motion. (Wicclair, David) (Entered: 08/16/2021) |
|---|---|---|
| 08/17/2021 | 29 | Transmission of Notice of Appeal and Docket Sheet as to Frankie Allan Durham to US Court of Appeals regarding 28 Notice of Interlocutory Appeal.NOTE: The Docketing Statement and Transcript Order Form, if you are court appointed counsel, are available on our website at website. (Foell, S.) (Entered: 08/17/2021) |
| 08/17/2021 | 30 | OFFICIAL TRANSCRIPT of MOTION HEARING as to Frankie Allan Durham held on Monday, August 2, 2021, before United States District Judge James C. Dever III. Court Reporter ~ Michelle McGirr. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Please review Attorney obligations regarding the redaction of electronic transcripts of court proceedings available on the court's website. Redaction Request due 9/10/2021. Redacted Transcript Deadline set for 9/20/2021. Release of Transcript Restriction set for 11/18/2021. (McGirr, M.) (Entered: 08/17/2021) |
| 08/17/2021 | | Notice of Filing of Official Transcript 30 Transcript. The parties have seven calendar days from the filing of the transcript to file a Notice of Intent to Request Redaction. The parties must also serve a copy on the court reporter or transcriber. After filing the Notice of Intent to Request Redaction, a party must submit to the court reporter or transcriber, within 21 calendar days of the filing of the transcript, a written statement indicating where the personal data identifiers to be redacted appear in the transcript. (McGirr, M.) (Entered: 08/17/2021) |
| 08/17/2021 | 31 | US Court of Appeals Case Number 21–4416 (Cyndi Halupa, Case Manager) for defendant Frankie Allan Durham as to 28 Notice of Interlocutory Appeal filed by Frankie Allan Durham. (Foell, S.) (Entered: 08/17/2021) |
| 08/17/2021 | 32 | ORDER of US Court of Appeals appointing the Public Defender as to Frankie Allan Durham regarding 28 Notice of Interlocutory Appeal. (Foell, S.) (Entered: 08/17/2021) |

**DURHAM APPENDIX 6**

FILED IN OPEN COURT
ON 6/3/2021 *[handwritten]*
Peter A. Moore, Jr., Clerk
US District Court
Eastern District of NC

## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF NORTH CAROLINA
#### WESTERN DIVISION

No. 5:21-CR-229- 1D(4) *[handwritten]*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | **INDICTMENT** |
| FRANKIE ALLAN DURHAM | ) | |

The Grand Jury charges that:

On or about November 5, 2020, in the Eastern District of North Carolina, FRANKIE ALLAN DURHAM, the Defendant herein, knowing he had previously been convicted of a crime punishable by imprisonment for a term exceeding one year, knowingly possessed a firearm, and the firearm was in and affecting commerce, in violation of Title 18, United States Code, Sections 922(g)(1) and 924.

[Remainder of page left intentionally blank]

1

FORFEITURE NOTICE

The Defendant is hereby given notice that all of the Defendant's interest in all property specified herein is subject to forfeiture.

Upon conviction of any of the offense(s) set forth in Count One of the Indictment, the Defendant shall forfeit to the United States, pursuant to Title 18, United States Code, Section 924(d), as made applicable by Title 28, United States Code, Section 2461(c), any and all firearms or ammunition involved in or knowingly used in one or more of the offenses. The forfeitable property includes, but is not limited to:

(a)  SCCY CPX-2 pistol, bearing serial number 918442; and

(b)  All magazines and related ammunition seized from the Defendant.

If any of the above-described forfeitable property, as a result of any act or omission of the Defendant,

(1)  cannot be located upon the exercise of due diligence;

(2)  has been transferred or sold to, or deposited with, a third person;

(3)  has been placed beyond the jurisdiction of the Court;

(4)  has been substantially diminished in value; or

(5)  has been commingled with other property which cannot be subdivided without difficulty.

2

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the above forfeitable property.

A TRUE BILL:

**REDACTED VERSION**
Pursuant to the E-Government Act and the federal rules, the unredacted version of this document has been filed under seal.

FOREPERSON

DATE: June 2, 2021

G. NORMAN ACKER, III
Acting United States Attorney

BY: ROBERT J. DODSON
Assistant United States Attorney
Criminal Division

3

```
 1                  UNITED STATES DISTRICT COURT

 2               EASTERN DISTRICT OF NORTH CAROLINA

 3
    UNITED STATES OF AMERICA,      )
 4                                 )
              Plaintiff,           )    DOCKET NO. 5:21-cr-00229-D-1
 5                                 )
         VS.                       )
 6                                 )
    FRANKIE ALLAN DURHAM,          )
 7                                 )
              Defendant.           )
 8                                 )
    _____)
 9
                  TRANSCRIPT OF INITIAL APPEARANCE
10              BEFORE THE HONORABLE JAMES E. GATES
                 THURSDAY, JULY 1, 2021; 4:49 P.M.
11                    RALEIGH, NORTH CAROLINA

12  FOR THE PLAINTIFF:
         United States Attorney's Office
13       By:  Lori Warlick, AUSA
              Adam Skrzecz
14       150 Fayetteville Street, Suite 2100
         Raleigh, NC  27601
15
    FOR THE DEFENDANT:
16       Office of Federal Public Defender
         By:  Joseph Ross, AFPD
17       150 Fayetteville St., Suite 450
         Raleigh, NC  27601
18

19
    Audio Operator:              COURT PERSONNEL
20

21       Proceedings recorded by electronic sound recording,
    transcript produced by transcription service.
22  _____

23                  JANICE RUSSELL TRANSCRIPTS
                       1418 Red Fox Circle
24                    Severance, CO  80550
                        (757) 422-9089
25                   trussell31@tdsmail.com
```

**DURHAM APPENDIX 10**

```
 1                  P R O C E E D I N G S
 2          THE COURT:  The other matters set for initial
 3   appearances this afternoon are ***, United States versus
 4   Frankie Allan Durham, and ***.
 5          Gentlemen, this is your initial appearance in United
 6   States District Court for the Eastern District of North
 7   Carolina.  We are not here this afternoon, of course, to
 8   determine whether you are guilty or not guilty on the charges
 9   that have been brought against you.  That's an issue for the
10   future.  Rather, the purpose of this proceeding is to formally
11   advise you of the charges against you, the maximum penalties
12   associated with those charges, as well as to advise you of
13   important rights that you have under the Constitution and laws
14   of the United States.
15          The first right I want to advise you of is your right
16   to counsel, that is, your right to have a lawyer or an
17   attorney.  All of those terms, lawyer, attorney, counsel, mean
18   the same thing, of course, and refer to a person's legal
19   representative.  You're entitled under the Constitution and
20   laws of the United States to be represented by an attorney at
21   every stage of the proceedings, including during any
22   questioning by the authorities, at any lineup, and at all court
23   proceedings, including this initial appearance.  You may
24   consult with an attorney before questioning may occur at any
25   proceeding.  If you are unable to afford counsel, then counsel
```

1    will be appointed for you.

2        Now we need to ask each of you gentlemen if you would

3    like me to appoint counsel to represent you.

4                                * * *

5        THE COURT:  And that -- you -- you -- let me explain

6    since you state "as of this moment."  You're absolutely right.

7    When I -- when I appoint -- when the Court appoints a lawyer

8    for you, that does not deprive you of the right, if you decide

9    later to go out and hire your own lawyer, you still have the

10   ability to do that.  If that were to happen, then the other

11   lawyer would enter a notice of appearance, a document, a formal

12   document that the lawyers have to file if they enter a case and

13   once that was filed, the appointed lawyer would file a motion

14   to withdraw from the case and the Court would allow it.

15       So you do, you don't sacrifice your right to retain

16   counsel of your choosing.

17                               * * *

18       THE COURT:  Mr. Durham, sir, would you like me to

19   appoint counsel to represent you?

20       DEFENDANT DURHAM:  I do.

21       THE COURT:  Very good.  Thank you.

22                               * * *

23       Gentlemen, I have reviewed the financial affidavits

24   that each of you submitted for purposes of appointment of

25   counsel.  I find that each of you is entitled to appointment of

1   counsel and I'm entering orders in your respective cases

2   appointing the Federal Public Defender's Office to represent

3   you.  Mr. Joseph Ross is the lawyer from that office seated

4   there at counsel table today there.  So he will be your lawyer

5   for today.  It is possible that his office will appoint one of

6   his colleagues to handle your case going forward.  That's the

7   normal process in our court.  Mr. Ross happens to be handling

8   court today for his office.  You're certainly in good hands

9   with Mr. Ross.  You'll be in good hands with any, any of his

10   colleagues.

11        I say that because the Federal Public Defender's

12   Office is much like a law firm that the Court has set up in

13   accordance with law for the very purpose of representing

14   defendants in criminal cases in our court.  The Court monitors

15   its operations to ensure that it provides quality service to

16   its clients, which it does.

17        Now as we go along here today if you have any

18   questions for Mr. Ross, need to speak with him for any reason,

19   I do want you to do that.  It's very important to him, it's

20   important to the Court that when you leave here you have a good

21   understanding of the information you're being provided.  For

22   your protection, though, I would ask that if you do need to

23   speak with Mr. Ross, instead of stating a question out in the

24   open you raise your hand to let him know, let me know that you

25   need to speak with him and then he can come over and talk with

1  you privately.  It's important that those discussions be

2  private and that you not state things out in the open except in

3  response to questions from the Court because anything that you

4  do say out in the open can be used against you and even a

5  question may indicate awareness of a fact and if the Government

6  believes it can use that against you, it is perfectly proper

7  for them to do that.

8         The other thing in this connection you need to be

9  aware of is that anything that any of us say out in the open is

10  being recorded.  These microphones are recording.  They're not

11  amplifying.  They're just recording which means that if a

12  defendant happens to say something that the Government believes

13  it can use against that person, the Government will have a

14  recording of it to play back to a judge or a jury at a later

15  date.  That circumstance is completely avoidable.  If you need

16  to speak with Mr. Ross, just raise your hand and he'll come

17  over and speak with you privately.

18         Mr. Ross, do these gentlemen have copies of the

19  respective indictments against them?

20         MR. ROSS:  They do.

21         THE COURT:  Very good.  Thank you, sir.

22         Gentlemen, you've all be charged by way of indictment.

23  That's one of several ways that criminal charges can be brought

24  against a person in the federal court system.  And an

25  indictment specifically is a charging document and by that I

1  mean, a set of accusations of criminal conduct that is issued

2  by a grand jury.  A grand jury is a group of between 16 and 23

3  people who are drawn randomly from the public.  The prosecutor,

4  that is, an Assistant United States Attorney, presents charges

5  to the grand jury, along with supporting evidence.  The grand

6  jury's job is to make two determinations, that is, the grand

7  jury must decide two things.  One, the grand jury must decide

8  whether there is probable cause to believe that the crime or

9  crimes alleged were committed.  Probably cause means fair

10  probability.  And then secondly, the grand jury must decide

11  whether there is probable cause to believe that the defendant

12  committed those crimes.  If at least 12 grand jurors agree with

13  the Government on these two probable cause issues, then the

14  grand jury will issue or return what is called a True Bill of

15  Indictment or simply Indictment for short.  And in this context

16  it is the return of those indictments that begin the

17  prosecution against a defendant.

18          Now the grand juries that had, that heard your cases

19  did have at least 12 members on them who agreed with the

20  Government on these two probable cause issues.  Those grand

21  juries returned indictments beginning the prosecutions against

22  you.  Indictments typically issue with arrest warrants which

23  explains why you're here in custody today.  While the grand

24  juries that heard your cases did agree with the Government, the

25  grand juries are independent bodies.  Again, they're just made

1   up of people just drawn randomly from the public.  It's not a,

2   it's not a, you know, a group of prosecutors.  It's just

3   regular folks drawn randomly from the public.

4           So if there are not at least 12 grand jurors who do

5   agree with the Government, then no indictment would go forward

6   at that time.  No indictment would be issued and the

7   prosecution would not go forward.  In essence, the grand jury

8   has the authority to tell the Government, "Look, you can't

9   prosecute this person now because you have not shown that

10  there's enough of a reason, that is probable cause, to believe

11  that he's committed the crimes that you, you're claiming he has

12  committed.  So you can't put him through a prosecution."  The

13  fact that the grand jury has this authority is intentional and

14  it's designed to help protect against the Government just

15  arbitrarily going out and putting people through prosecutions

16  for serious crimes when there simply is not an adequate reason

17  to believe that they have committed them.

18          So that's, that's a civil liberties protection and

19  it's one of the main reason why your cases and cases like it

20  are required by the Constitution to go through this indictment

21  process.

22          Okay.  With that introduction, I want to turn to the

23  indictments against you, Mr. Durham, and you, ***.  You're

24  charged in separate cases, but the charge against you is for

25  the same offense, that is, possession of a firearm by a

**DURHAM APPENDIX 16**

1    convicted felon.  In your case, Mr. Durham, the charge

2    specifically is that on or about November 5th of last year,

3    2020, in this District you, knowing that you had previously

4    been convicted of a crime punishable by imprisonment for a term

5    exceeding one year, that is a felony, knowingly possessed a

6    firearm and the firearm was in and affecting commerce, in

7    violation of Title 18 of the United States Code, Sections

8    922(g)(1) and 924.

9                              * * *

10        THE COURT:  Now with respect to both of your

11   indictments, there is a forfeiture notice and let me review

12   that with you.  That notice gives you, advises you that upon

13   conviction of the offense charged the Government seeks

14   forfeiture of any and all firearms or ammunition involved in or

15   used in knowing commission of the charged offense.

16        In your case, Mr. Durham, the forfeitable property

17   allegedly includes, but is not limited to, an SCCY CPX-2 pistol

18   with a specified serial number as well as all magazines and

19   related ammunition seized from you.

20                             * * *

21        THE COURT:  If this forfeitable property cannot be

22   recovered from you, Gentlemen, as a result of any act or

23   omission on your part, the Government's advising you it seeks

24   substitute property up to the value of the forfeitable

25   property.

```
 1              Now in a moment I'm going to ask the prosecutor to
 2    advise you of the maximum penalties that you face on these
 3    charges.  I want to explain some terminology to you,
 4    Mr. Durham, and you, ***, as well as to you, ***, and you, ***,
 5    of terms that you're going to hear used in describing the
 6    maximum penalties in each of your cases.  One term I'm
 7    referring to is supervised release.  Supervised release refers
 8    to a period of supervision of a defendant by the United States
 9    Probation Office that comes after any term of imprisonment.
10    It's very much like probation in that the defendant is free in
11    the community, but subject to certain conditions that the Court
12    sets and these are such things as having to report to the
13    probation officer, not committing any further offenses, drug
14    testing, things of that nature.
15              But supervised release is unlike probation in that it
16    does not take the place of imprisonment, but it comes
17    afterwards.  It's designed to be a period of transition for a
18    defendant as that person moves from life in custody back into
19    regular civilian life.  As you will hear, the law places a
20    maximum on the term of supervised release that can be imposed
21    with respect to any offense.  Some offenses have minimum terms
22    and if that applies to any offense with which you are charged,
23    you will be advised of that.
24              You will also hear reference made to revocation of
25    supervised release.  What that refers to is the circumstance in
```

1   which there's sufficient violations of the conditions of

2   release that the Court revokes it and returns the defendant to

3   prison.  In that circumstance, the law places a maximum on the

4   term of imprisonment that may be imposed.

5           You'll be given two dollar figures.  One is called a

6   special assessment.  It's in the nature of a fee.  It's a

7   relatively nominal amount.  For most felony offenses in the

8   federal system, it's a hundred dollars.  The other dollar

9   figure is much larger.  It's the maximum fine.  It's in

10  thousands of dollars.  It's not a fee.  It's intended as

11  punishment.  But do keep in mind that the figure you will be

12  getting is the maximum and if there were to be a conviction,

13  the Court can impose a fine that is less than the maximum.

14          With that introduction, if I could call on counsel for

15  the Government to advise Mr. Durham and *** of the maximum

16  penalties they face on the charges against them.  And I believe

17  they would be the same maximum for both defendants.

18          MR. SKRZECZ:  Yes, your Honor.

19          THE COURT:  Mr. Skrzecz.

20          MR. SKRZECZ:  If it pleases the Court, may I read

21  it --

22          THE COURT:  Please.

23          MR. SKRZECZ:  -- once to address both defendants?

24  Thank you.

25          For Count 1 in both cases the maximum penalty is not

1   more than ten years imprisonment, a fine not to exceed

2   $250,000, or both fine and imprisonment, not more than three

3   years supervised release, not more than two years imprisonment

4   upon revocation of supervised release, a $100 special

5   assessment, and restitution if applicable.

6          If found to be an armed career offender, then the

7   maximum penalty is a term of imprisonment not less than 15

8   years, but not more than life imprisonment, a fine not to

9   exceed $250,000, or both fine and imprisonment, not more than 5

10  years supervised release, not more than 5 years imprisonment

11  upon revocation of supervised release, a $100 special

12  assessment, and restitution if applicable.

13          THE COURT:  Very well.

14          And what is the Government's position regarding the

15  liberty status of these two defendants?

16          MR. SKRZECZ:  The Government seeks detention for both,

17  your Honor.

18          THE COURT:  Okay.  Very well.

19          I'll come back to this issue of detention, Gentlemen,

20  and explain what that's about 'cause it may affect others here

21  this afternoon.

22                              * * *

23          THE COURT:  Again, I'll come back to that issue in a

24  few minutes, Gentlemen.

25                              * * *

```
 1              THE COURT:  Okay, Gentlemen.  Let me turn now to this
 2    issue of detention.  As you heard, the Government has requested
 3    detention in each of your cases.  What that means is that the
 4    Government is asking the Court to enter an order that would
 5    detain you, that is, hold you in custody, pending further
 6    proceedings in your case.  And when I say "pending further
 7    proceedings in your case," I mean up until either a trial or
 8    entry of a guilty plea in place of a trial.  Now each of you is
 9    entitled to a hearing on this request by the Government.  That
10    hearing is called a detention hearing, again because being held
11    in custody in this context is referred to as being detained.
12              The principal question at the detention hearing will
13    be whether there is any condition or combination of conditions
14    authorized by law that would reasonably assure your appearance
15    as required, that is, reasonably assure that you show up in
16    court when you're required to do so, as well as the safety of
17    any other person and the community pending further proceedings
18    in your case.
19              The conditions I'm speaking of here are such things as
20    having to report to the probation officer;, there can be
21    location monitoring which typically involves wearing an ankle
22    bracelet the location of which is monitored electronically;
23    having a third-party custodian, typically a family member but
24    can also be a friend, who would provide supervision and
25    guidance, but would also have the legal obligation to report
```

**DURHAM APPENDIX 21**

1  any violations that he or she became aware of.  There could be

2  confinement to one's home.  That confinement, or, or the

3  custodian's home, if there is a custodian.  That confinement

4  can be on a curfew basis, having to be in that home during a

5  particular period of the day, all the way up to home

6  incarceration, having to be in that home all day every day

7  except for medical emergencies, court dates, or other

8  activities preapproved by the Court.  That's just a sampling of

9  the conditions that could be imposed.  Any conditions that

10  would reasonably address this, the, the issue of flight risk

11  and, and danger really are fair game for the Court.

12          Now at this detention hearing, Gentlemen, each of you

13  has the right to be represented by counsel.

14          In addition, you may testify, if you choose to, but

15  you would not have to testify.

16          You may present witnesses.

17          You may also cross-examine, that is, ask questions,

18  of, of witnesses who appear at the hearing.

19          And you could present information by means other than

20  through witnesses, such as by describing to the Court evidence

21  that you would like it to consider.

22          You do have the right to waive or give up this

23  detention hearing.  If you were to do so, then no such hearing

24  would be held and you would remain in custody pending further

25  proceedings in your case.  The decision to waive a detention

1  hearing is, obviously, a very significant one because it

2  affects directly your personal liberty.  So it's a decision

3  that should be made only after conferring carefully with your

4  counsel.

5         If you do elect to waive, then there are two ways to

6  do it.  One is to come back to court, sign a short form, and

7  then the Court would ask you question to make sure the waiver

8  was being provided knowingly and voluntarily.  If you prefer

9  not to come back to court to do that, then there's a somewhat

10 longer form that would need to be completed and if that is

11 filed no later than 1:00 on the last business day before the

12 date set for the hearing, the hearing would be cancelled

13 without your having to come back to court.

14        Again, though, whether to waive is your decision.  If,

15 if you decide to waive, then how to waive is your decision as

16 well, but those are matters that should be discussed with your

17 lawyer.

18        Gentlemen, I'm going to schedule your detention

19 hearing for this coming Wednesday, which is July 7th, at 10:30

20 a.m. in this courtroom.

21        Now the law requires that for any defendant in any

22 case until this detention hearing is held that person must be

23 held in custody.  So at the end of our proceedings here today

24 as the law requires the Court will be remanding each of you to

25 the custody of the United States Marshal.

DURHAM APPENDIX 23

```
 1          Let me now advise all of you of additional important
 2   rights that you have under the Constitution and laws of the
 3   United States.
 4          The first right I want to mention here is your right
 5   to remain silent, also known as the right against self-
 6   incrimination.  This right holds that nobody can require you to
 7   answer any questions or make any statements about the charges
 8   facing you.  If you've already made a statement about the
 9   charges, you do not need to say any more.  If you start to make
10   a statement, you may stop at any time.  This right to remain
11   silent can be waived and if you do waive the right to remain
12   silent, then anything you say may be used against you.
13          I don't have any information on your citizenship,
14   Gentlemen, so let me advise you that a defendant who is not a
15   United States citizen may request that an attorney for the
16   Government or a federal law enforcement official notify a
17   consular officer from the defendant's country of nationality
18   that the defendant has been arrested.  Even without the
19   defendant's request, a treaty or other international agreement
20   may require consular notification.
21          Now in accordance with the Federal Rules of Criminal
22   Procedure, the Court is entering in each of your cases an order
23   relating to the Supreme Court's decision in Brady v. Maryland.
24   That case held in general terms that if the Government has
25   evidence that's favorable to a defendant and that is also
```

1    material to either the issue of guilt or to punishment, if the

2    defendant requests that evidence, the Government must produce

3    it to him.  This order provides more specifically that pursuant

4    to Rule 5(f)(1) of the Federal Rules of Criminal Procedure, as

5    added by the Due Process Protections Act of last year, the

6    Court hereby confirms that in this case the Government is

7    subject to the disclosure obligation of the prosecution

8    recognized in Brady v. Maryland and its progeny.  "Progeny"

9    simply means subsequent court decisions that apply and

10   interpret the Brady decision.  Brady provides that:

11          "The suppression by the prosecution of evidence

12           favorable to an accused upon request violates due

13           process where the evidence is material either to guilt

14           or to punishment irrespective of the good faith or bad

15           faith of the prosecution."

16          Failure by the Government to comply in this case,

17   meaning each of your cases, with its disclosure obligation

18   under Brady and its progeny in violation of this order or

19   otherwise can result in reversal of a conviction, vacation of a

20   sentence, and imposition of sanctions against the individuals

21   responsible for the violation, among other consequences.

22          Now at a later date, Gentlemen, each of you will be

23   asked to plead guilty or not guilty to the charges in the

24   indictment against you.  If you plead guilty, then there will

25   not be a trial.  You will be admitting that you committed the

1    crimes charged.  On the other hand, if you plead not guilty,

2    then there will be a trial.

3         At trial, you have several important rights.  You have

4    the right to counsel and to have one appointed if you cannot

5    afford one.

6         You will be presumed innocent.  There will be no

7    burden on you to prove anything.  The Government must prove you

8    guilty beyond a reasonable doubt.

9         In addition, the Government must bring its witnesses

10   to court.  You or your attorney are allowed to cross-examine

11   these witnesses, that is, to ask them questions.  This right

12   stems from your right to confront witnesses against you.

13        At trial, of course, you've also got the right to

14   present evidence on your own behalf and that includes the right

15   to subpoena witnesses, that is, the right to have the Court

16   issue orders called subpoenas directing witnesses to come to

17   trial so that they may testify for you.

18        You, yourself, have a choice of whether to testify or

19   not to testify.  This right derives from your right to remain

20   silent.  No adverse inference, that is, no suggestion that you

21   are guilty, is to be drawn from a decision by you not to

22   testify and the judge will so instruct the jury.

23        And, of course, you have the right to trial by a jury.

24        Gentlemen, I've now gone over with you the information

25   I needed to cover with you today, but I do want to check back

```
1   with you to make sure that you've heard and understood

2   everything.  If you do have questions, Mr. Ross can assist with

3   those as can the Court as appropriate.

4           Mr. Durham, sir, let me begin with you.  Sir, have

5   you, in fact, heard everything we've gone over here today?

6           DEFENDANT DURHAM:  Yes, sir.

7           THE COURT:  Very good, sir.  Do you believe you've

8   understood everything?

9           DEFENDANT DURHAM:  Yes, sir.

10          THE COURT:  Any questions, Mr. Durham??

11          DEFENDANT DURHAM:  No, sir.

12          THE COURT:  Okay.  Thank you.

13                              * * *

14          THE COURT:  Okay.  Mr. Ross, anything further on

15  behalf of any of these gentlemen at this time?

16          MR. ROSS:  No, sir.

17          THE COURT:  Thank you.

18          Mr. Skrzecz, anything further for the Government at

19  this time in any of these four matters?

20          MR. SKRZECZ:  No, sir.

21          THE COURT:  Very well.

22          I remand these defendants, then, to the custody of the

23  United States Marshal.

24      (Proceedings concluded at 5:20 p.m.)

25
```

```
 1                    CERTIFICATE OF TRANSCRIBER

 2            I, Janice Russell, court-approved transcriber, in and

 3  for the United States District Court for the Eastern District

 4  of North Carolina, do hereby certify that pursuant to Section

 5  753, Title 28, United States Code, that the foregoing is a true

 6  and correct transcript from the official electronic sound

 7  recording of the proceedings held in the above-entitled matter

 8  and that the transcript page format is in conformance with the

 9  regulations of the Judicial Conference of the United States.

10

11                    Dated this 12th day of August, 2021.

12

13                    /s/ JANICE RUSSELL
                      JANICE RUSSELL
14                    COURT-APPROVED TRANSCRIBER

15

16

17

18

19

20

21

22

23

24

25
```

**DURHAM APPENDIX 28**

```
 1                 UNITED STATES DISTRICT COURT

 2               EASTERN DISTRICT OF NORTH CAROLINA

 3

   UNITED STATES OF AMERICA,      )
 4                                )
              Plaintiff,          )    DOCKET NO. 5:21-cr-00229-D-1
 5                                )
         VS.                      )
 6                                )
   FRANKIE ALLAN DURHAM,          )
 7                                )
              Defendant.          )
 8                                )
   _____)
 9
               TRANSCRIPT OF DETENTION HEARING
10            BEFORE THE HONORABLE JAMES E. GATES
              WEDNESDAY, JULY 7, 2021; 10:45 A.M.
11                  RALEIGH, NORTH CAROLINA

12 FOR THE PLAINTIFF:
        United States Attorney's Office
13      By:  Yasir Sadat, AUSA
        150 Fayetteville Street, Suite 2100
14      Raleigh, NC  27601

15 FOR THE DEFENDANT:
        Office of Federal Public Defender
16      By:  Katherine Shea, AFPD
        150 Fayetteville St., Suite 450
17      Raleigh, NC  27601

18

19 Audio Operator:              COURT PERSONNEL

20

        Proceedings recorded by electronic sound recording,
21 transcript produced by transcription service.
   _____

22
                  JANICE RUSSELL TRANSCRIPTS
23                   1418 Red Fox Circle
                   Severance, CO  80550
24                    (757) 422-9089
                  trussell31@tdsmail.com
25
```

DURHAM APPENDIX 29

```
 1                    P R O C E E D I N G S

 2        (Call to Order of the Court)

 3             THE COURT:  Good morning, folks.

 4             MS. SHEA:  Morning, your Honor.

 5             MR. SADAT:  Morning, Judge.

 6             THE COURT:  Let's begin with the case of United States

 7    versus Frankie Allan Durham.  This matter was set for a

 8    detention hearing, however, my understanding is that Mr. Durham

 9    wishes to waive that proceeding.

10             Mr. Durham, sir, I do need to ask you a brief series

11    of questions regarding this form entitled Waiver of Detention

12    Hearing that I have before me.  My job is to make sure that the

13    waiver reflected on this form is being provided by you

14    knowingly and voluntarily.  You may, of course, speak with

15    Ms. Shea as your lawyer before answering any of my questions,

16    if you care to do so.

17             My first question, sir, is did you sign this form

18    entitled Waiver of Detention Hearing after reviewing it with

19    Ms. Shea?

20             THE DEFENDANT:  Yes, sir.

21             THE COURT:  Very good, sir.  And you understand this

22    form?

23             THE DEFENDANT:  Yes, sir.

24             THE COURT:  Very good.  Sir, do you understand that

25    you have the right to a hearing called a detention hearing on
```

**DURHAM APPENDIX 30**

1   whether you should be held in custody pending further

2   proceedings in your case all the way up to either a trial or

3   entry of a guilty plea in place of the trial?  Do you

4   understand that?

5           THE DEFENDANT:  Yes, sir.

6           THE COURT:  Do you also understand, sir, that the

7   principal issue at this detention hearing would be whether

8   there's any condition or combination of conditions authorized

9   by law that would reasonably assure your appearance as required

10  as well as the safety of any other person and the community

11  pending further proceedings in your case?

12          THE DEFENDANT:  Yes, sir.

13          THE COURT:  Sir, do you also understand that at this

14  detention hearing you'd have a number of important rights.

15  You'd have the right to be represented by counsel; you,

16  yourself, could testify, if you chose to but you would not have

17  to testify; you could present witnesses; you could cross-

18  examine witnesses; and you could present information by means

19  other than through witnesses?  Do you understand all of that?

20          THE DEFENDANT:  Yes, sir.

21          THE COURT:  Do you also understand, sir, that by

22  waiving your right to this detention hearing there will not be

23  a detention hearing and you will remain in custody pending

24  further proceedings in your case, again up until either a trial

25  or entry of a guilty plea in place of a trial?

**DURHAM APPENDIX 31**

```
 1              THE DEFENDANT:  Yes, sir.

 2              THE COURT:  Very good, sir.

 3              Okay, Mr. Durham.  Keeping in mind all that we've gone

 4    over, is it, in fact, your agreement and your intention to

 5    waive your right to a detention hearing?

 6              THE DEFENDANT:  Yes, sir.

 7              THE COURT:  Very well, sir.

 8              I find that Mr. Durham's waiver of his right to a

 9    detention hearing is knowingly and voluntarily provided.  I

10    will accept this waiver on behalf of the Court.

11              Ms. Shea, ma'am, anything further on behalf of

12    Mr. Durham for this morning?

13              MS. SHEA:  Not at this time.  Thank you, your Honor.

14              THE COURT:  Very good.

15              Anything further for the Government at this time?

16              MR. SADAT:  No, your Honor.  Thank you.

17              THE COURT:  Very well.  Thank you, sir.

18              I remand Mr. Durham, then, to the custody of the

19    United States Marshal.

20         (Proceedings concluded at 10:48 a.m.)

21

22

23

24

25
```

**DURHAM APPENDIX 32**

1              CERTIFICATE OF TRANSCRIBER

2              I, Janice Russell, court-approved transcriber, in and

3    for the United States District Court for the Eastern District

4    of North Carolina, do hereby certify that pursuant to Section

5    753, Title 28, United States Code, that the foregoing is a true

6    and correct transcript from the official electronic sound

7    recording of the proceedings held in the above-entitled matter

8    and that the transcript page format is in conformance with the

9    regulations of the Judicial Conference of the United States.

10

11             Dated this 12th day of August, 2021.

12

13             /s/ JANICE RUSSELL
               JANICE RUSSELL
14             COURT-APPROVED TRANSCRIBER

15

16

17

18

19

20

21

22

23

24

25

DURHAM APPENDIX 33

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

5:21-cr-00229-D-1

| | |
|---|---|
| UNITED STATES OF AMERICA | EMERGENCY MOTION FOR RELEASE AND INCORPORATED MEMORANDUM OF LAW AND IN THE ALTERNATIVE FOR STAY OF TRANSFER |
| v. | |
| FRANKIE ALLAN DURHAM | |

The defendant, Frankie Allan Durham ("Mr. Durham"), by and through undersigned counsel, hereby moves this Court, pursuant to 18 U.S.C. § 3142(c) and (f), to reopen the issue of whether he should be detained pending further proceedings in this case and, after doing so, release him from custody based on now-available information that was not known to Mr. Durham when he waived his detention hearing on July 7, 2021. The specific bases include his being accepted into a long-term inpatient substance abuse treatment program in Raleigh, North Carolina, and his imminent transfer to Tallahatchie County Correctional Facility ("TCCF") in Tallahatchie, Mississippi.

In the alternative, Mr. Durham very respectfully requests that this Court stay his pending transfer to TCCF as it would infringe upon both Mr. Durham's Sixth Amendment right to counsel and his right of access to counsel conferred by the Bail Reform Act. The United States Marshals Service ("USMS") has scheduled Mr. Durham to be transferred to TCCF, although the exact date of transfer is unknown. *See Exhibit 1 -* Email re: Tallahatchie Transfer List and Attachment. TCCF is located approximately 800 miles from the closest courthouse in the Eastern District of North Carolina, where Mr. Durham is charged.

## PROCEDURAL HISTORY

On June 3 2021, Mr. Durham was named in a one-count indictment filed in the Eastern District of North Carolina charging him with possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924. Mr. Durham had his initial appearance for this charge on July 1, 2021. On July 7, 2021, Mr. Durham waived his detention hearing.

Mr. Durham is currently in the custody of the United States Marshals Service at Wake County Detention Center in Raleigh, North Carolina.  He is on the list for transfer imminently to TCCF. Arraignment in this matter is currently set for the Court's August 23, 2021, term.

## ARGUMENT

### A.  Mr. Durham Should Be Released Pursuant to the Bail Reform Act

The Bail Reform Act, 18 U.S.C. § 3142, governs whether a defendant shall be released or detained pending his trial in a federal criminal case. If an appropriate basis for detention exists and an attorney for the government moves for detention, the court must hold a hearing to determine whether the defendant should in fact be so detained. *Id.* § 3142(f). At such a hearing, the Court's task is to "determine whether any condition or combination of conditions . . . will reasonably assure the appearance of such person as required and the safety of any other person and the community." *Id.* If there are no such conditions, the judicial officer presiding over the hearing "shall order the detention of the person before trial." *Id.* § 3142(e)(1).

Though Mr. Durham waived his detention hearing, § 3142(f) provides that:

> the hearing as to whether such a condition or combination of conditions exists may be reopened, before or after a determination by the judicial officer, at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue

> whether there are conditions of release that will reasonably assure
> the appearance of such person as required and the safety of any other
> person and the community.

*Id.* § 3142(f). As the Fourth Circuit has held, "a defendant who has waived an immediate detention

hearing [and] later requests a hearing" must be afforded one "within the procedural requirements

of section 3142. In this sense, Defendants' 'waiver' of an immediate detention hearing can be

viewed as a request for an indefinite continuance for good cause." *United States v. Clark*, 865 F.2d

1433, 1437 (4th Cir. 1989).

Since the date of his waiver, Mr. Durham has been accepted into Healing Transitions, a

long-term inpatient substance abuse treatment program in Raleigh, North Carolina. *See Exhibit 2*

– Letter of Acceptance to Healing Transitions. He has also learned of his imminent transfer to

TCCF.

Mr. Durham submits that his acceptance into a long-term inpatient treatment facility

combined with his imminent transfer 800 miles away from the EDNC constitutes a fundamental

change in circumstances requiring his release on conditions under the Bail Reform Act and *United*

*States v. Salerno*, 481 U.S. 739 (1987). The defense requests that the Court order Mr. Durham's

release with the condition that he reside at and follow the strict protocols of the Healing Transitions

recovery program as well as any additional conditions the Court deems appropriate. The defense

is prepared for a bail hearing if necessary.

**B. Alternatively, Mr. Durham's Transfer 800 Miles Out of District Should Be Stayed**

Transfer in this case would infringe upon both Mr. Durham's Sixth Amendment right to

counsel and his right of access to counsel conferred by the Bail Reform Act. *See Cobb v. Aytch*,

643 F.2d 946, 957 (3rd Cir. 1981) (noting that conditions of pretrial detention impinging access to

counsel can infringe upon the Sixth Amendment); *see also* 18 U.S.C. § 3142(i)(3) (requiring the judicial officer issuing a detention order to "direct that the person be afforded reasonable opportunity for private consultation with counsel."). Mr. Durham has not yet entered a plea and his arraignment date is set for the August 23, 2021, term of court. Housing him over 800 miles from counsel will severely hamper the undersigned's ability to provide constitutionally adequate representation because it is unclear whether an inmate at TCCF has the ability to review discovery including video evidence such as body and dash camera footage and sensitive documents (such as the PSR) via video conferencing. The significant distance further risks damage to the undersigned counsel's ability to advise Mr. Durham on pleading decisions, trial strategy, and the sentencing process. *See Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 124 (2d Cir. 2020) (discussing alleged Sixth Amendment violations where access by Federal Defenders of New York to detained clients was significantly curtailed).

As the Court is no doubt aware, the impending transfer also presents significant risks to the efficient administration of justice. For each pre-trial or pre-sentencing defendant who is transferred so far away from the district, the Court risks disruption to its ability to expeditiously administer cases as the Court awaits long-distance transfers. This concern was emphasized by USMS in an email to the Court. *See Exhibit 1 -* Email re: Tallahatchie Transfer List and Attachment (stating that there is no assurance "that there will not be any disruption to the judicial process within our district" as there is not "a solidified process to return prisoners for their court hearings"). The costs of such transfers, and of transporting appointed counsel to meet with clients, could also be avoided by granting the requested relief.

While the undersigned is sensitive to the plight of the USMS described in *Exhibit 1,* there

are other options that would address the housing shortage without posing the same constitutional concerns for pretrial detainees, such as transferring only defendants who are post-sentencing to TCCF or housing defendants at a facility closer than 800 miles out of district. The transfer list, as it stands, appears to have no rhyme or reason with respect to the posture of each individual case. Accordingly, Mr. Durham respectfully requests that this Court enter an order requiring the USMS to stay Mr. Durham's transfer to TCCF and set this case for hearing to explore constitutionally adequate housing arrangements, order the USMS to permanently house Mr. Durham at a facility in North Carolina, or order any other relief it deems appropriate.

## CONCLUSION

WHEREFORE, Mr. Durham respectfully requests the Court find that his acceptance into a long-term inpatient substance abuse treatment program in conjunction with his imminent transfer to TCCF constitutes a material change in circumstances from when he waived his detention hearing, thereby allowing the Court to reopen the issue of detention under 18 U.S.C. § 3142(f) and order Mr. Durham's release with the condition that he reside at and follow the strict protocols of the Healing Transitions recovery program as well as any additional conditions the Court deems appropriate. Mr. Durham is prepared for a bail hearing if necessary.  In the alternative, Mr. Durham respectfully requests that this Court enter an order requiring the USMS to stay Mr. Durham's transfer to TCCF and set this case for hearing to explore constitutionally adequate housing arrangements, order the USMS to permanently house Mr. Durham at a facility in North Carolina, or order any other relief it deems appropriate.

Respectfully requested this 29th day July, 2021.

G. ALAN DUBOIS
Federal Public Defender

*/s/ David E. Wicclair*
DAVID E. WICCLAIR
Assistant Federal Public Defender
Office of the Federal Public Defender
150 Fayetteville Street, Suite 450
Raleigh, NC 27601
Telephone: 919-856-4236
Email: david_wicclair@fd.org
N.C. State Bar No. 50384
LR 57.1 Counsel Appointed

*CERTIFICATE OF SERVICE*

I HEREBY CERTIFY that a copy of the foregoing was served upon:

ROBERT J. DODSON
U.S. Attorney's Office
150 Fayetteville Street, Suite 2100
Raleigh, NC 27601
Email: Robert.Dodson@usdoj.gov

by CM/ECF.

This the 29th day of July, 2021.

*/s/ David E. Wicclair*
DAVID E. WICCLAIR
Assistant Federal Public Defender
Office of the Federal Public Defender
150 Fayetteville Street, Suite 450
Raleigh, NC 27601
Telephone: 919-856-4236
Email: david_wicclair@fd.org
N.C. State Bar No. 50384
LR 57.1 Counsel Appointed

**DURHAM APPENDIX 39**

**From:** Moltzan, Lawrence (USMS) ██████████████████████
**Sent:** Friday, July 23, 2021 5:26:56 PM
**To:** ███████████████████████████████

████████████████████████████████████████
███████████████████████████████
████████████████████████████████████████
█████████████████████████████
██████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████
█ ████████████████████████████████
████████████████████████████████████

**Subject:** RE: EDNC Prisoner Housing

Good Afternoon All,
Attached is the listing of prisoners we are planning to move to Tallahatchie. It is not a perfect list, nor was there perfect science behind all of our selections, but it is a best effort to avoid immediate issues across the district in short time. If any changes/additions come, we will continue to communicate early and often.

Have a great weekend, and thank you again for your partnership.

V/R,
Larry

Larry Moltzan
Chief Deputy U.S. Marshal
Eastern District of North Carolina
███████████████████████

---

**From:** Moltzan, Lawrence (USMS)
**Sent:** Friday, July 23, 2021 2:05 PM
**To:** ███████████████████████████████

████████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████████
█████████████████████████████████

**EXHIBIT 1**

DURHAM APPENDIX 40

████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████ ████████████████████████████████
██████████████████████████████████████
████████████████████████████████████

**Subject:** RE: EDNC Prisoner Housing

Good Afternoon All,

I have some updates on VTC and contact numbers for Tallahatchie, below and attached.

**Acting IT POC:**
QA Jennifer Watts Office: ███████████████████████████████

**TCCF's POCs for VTC calls:**
Grievance Coordinator Shirquita Walker     ████████████████████████████
Grievance Clerk Jessica Phillips           ████████████████████████████
████████████████████

**Type of VTC Equipment:**
Poly Group Series 310 video conferencing units. The video calls come into the facility over a public NAT IP address. The contract would need to provide their own static Public IP address to dial into the systems.  The facility cannot dial any call out.

**Requesting VTC:**
Email ████████████████████████ and cc ████████████████████████. The facility requires the request 24 hours in advance of the calls and can schedule between 9:00 am – 2:00pm CST. Once they receive the request, they will confirm and send a port room number by the end of the day.  They are available for any questions via email as well.

**Attorney calls** are not recorded or monitored if the phone number is listed as an attorney number. The inmate will need to submit an attorney number verification form, attached here, or the attorney can submit to ████████████████████████.  Submission by an attorney should be a written request on their official letterhead, listing their phone number and address for verification.  Once one of those two is submitted, the facility will verify the number and ensure it is marked as do not record within the inmate telephone system.

Please let me know if you have any further questions or need any additional information.  We are still working to identify the names of those transferring, and hope to have something to you by the end of the day today.

V/R,
Larry

Larry Moltzan
Chief Deputy U.S. Marshal
Eastern District of North Carolina



**From:** Moltzan, Lawrence (USMS) ███████████████████
**Sent:** Thursday, July 22, 2021 5:05 PM
**To:** ████████████████████████████████

**Subject:** RE: EDNC Prisoner Housing

<mark>CAUTION - EXTERNAL:</mark>

Good Afternoon Court Family,

I wanted to update you as to the status of USMS prisoner housing.  To date, there has been no advancement from our Headquarters on a reasonable solution close to or within our district, and the current status of prisoner housing has gotten gravely worse.

In the past few days we have been asked by New Hanover County, Wake County, and Albemarle District Jail to reduce the number of prisoners held there by at least 20 per facility.  In addition to that, the USMS has seen an uptick of concerns for prisoner safety and medical care at some of the facilities into which we have recently expanded.  In one extreme example, we recently learned of the sexual assault of a USMS prisoner in Granville County several weeks after it likely occurred and only from defense counsel.  It also appears that the facility may have known of this for a couple of weeks and, until the last couple of days when the USMS started to ask questions, had taken no steps to investigate or report as required.  Given this scenario and others, for the safety and wellbeing of our prisoners, I feel compelled to remove all 46 USMS prisoners from Granville County Jail; this unfortunately only exacerbates our housing crisis.

I had an online meeting with our Headquarters this afternoon where it was officially decided that 100 of our pretrial/presentence prisoners will be moved to Tallahatchie, MS.  We will begin the paperwork tomorrow and the move is likely to be scheduled for late next week.  Once we identify the prisoners being moved, we will share that list with everyone.  I have asked my Headquarters for a solidified process to return prisoners for their court hearings and for assurance that there will not be any disruption to the judicial process within our district.  Unfortunately, I got no such assurance and left the meeting with more questions than answers.  The facility at Tallahatchie does have VTC and

we will work to ascertain type/system and develop a process to schedule hearings as requested.  The USMS requests as much advanced notice as possible when scheduling, especially if the prisoner will be needed in person.

Please know that the local USMS team within the district will do everything possible to minimize any impact to the courts and all related parties.  If you have any questions, please don't hesitate to reach out.

V/R,
Larry


Larry Moltzan
Chief Deputy U.S. Marshal
Eastern District of North Carolina
█████████████████████
████████████████

---

**From:** Moltzan, Lawrence (USMS)
**Sent:** Friday, June 18, 2021 12:55 PM
**To:** ██████████████████████████████
██████████████████████████
████████████████████████
████████████
███████████████████████████
██████████████████████
██████████████████
█████████████████████
███████████████████████
████████████████████████
██████████████████
███████████████████
█████████████████
█████████████
**Subject:** EDNC Prisoner Housing

Good Afternoon Court Family,

I wanted to reach out to share information about prisoner housing concerns that the USMS is currently facing.  We have been able to speak to some of you to date, but wanted to also reach out via email so that we can ensure that the information reaches the entire court family.

As you are all aware, the USMS has long struggled with various issues related to prisoner housing within the EDNC.  Over the past year, our issues were inflamed when our extremely high numbers met with the Covid-19 pandemic.  While we typically used 12-14 facilities across the District in the past, this forced the USMS to expand to using approximately 21 different facilities across three states.  In the past few weeks, due to local/county political issues, the USMS lost the ability house prisoners at Pitt County and Franklin County and we are likely to lose Edgecombe County before the

end of the month. This forces the USMS to find homes for approximately 180 of our ~800 prisoners amongst our already limited bedspace, which has proved to be an impossible task. As of June 17th, Pitt County has allowed the USMS to bring back a limited number of prisoners, which we already filled with prisoners leaving Franklin County, but we are not sure if this will remain long term.

In November of last year, the USMS began attempts to secure prisoner bed space at Rivers Correctional in Hertford County which would solve a host of issues including space, prisoner medical treatment, availability/accessibility of video and visitation, transportation, and multiple administrative and transportation burdens. Unfortunately, our Headquarters is as yet unable to procure that space due to the Executive Order regarding private prisons which was delivered just before they were set to finalize the paperwork. We have been working closely with our Headquarters regarding the justification and need for Rivers, and all necessary information is with the Deputy Attorney General's office pending further decision. We believe that this would be the best course of action for the EDNC, but it is currently unknown if we will ever receive approval to move forward with Rivers.

The only solution that the USMS is able to execute is to expand to even more facilities, some further than those currently in use. Late yesterday I learned that our Headquarters is close to securing us space at FCI Petersburg (Richmond, VA) and FCI Bennettsville (Bennettsville, SC), and has also posed the possibility of utilizing a facility in Tallahatchie, MS, though hopefully as a last resort. I know that neither of these is a preferred option, with MS being additionally troublesome, and it poses severe logistical challenges for our office. We are also aware of the burdens that this will place on Defense attorneys, Probation, and potentially the courts, as well as to the prisoners themselves who will have to travel significantly and may have limited access to their representation.

We will be maximizing the use of our local facilities, but, as of today, it looks as if the USMS will be forced to move at least 75-100 pretrial/presentence prisoners to these new facilities once finalized. This is likely to begin as early as the next couple of weeks. All efforts will be made to ensure that there is no disruption to our ability to present prisoners in court when required, and we are happy to work with all parties to minimize impact where possible. I know that this places a huge burden on the court family, FPD and probation especially, and for that we are extremely sorry. We are continuing to work daily with our Headquarters for additional and better options, for the prisoners and the court family, and we will do our best to communicate early and often as this rapidly evolving situation continues.

Please don't hesitate to reach out if you have any questions or need anything additional from the USMS. Have a great weekend.

V/R,
Larry

Larry Moltzan
Chief Deputy U.S. Marshal
Eastern District of North Carolina

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**DURHAM APPENDIX 44**

| Facility | Name | USMS# | Status |
|---|---|---|---|
| Granville | Hartsfield, John | 40845-509 | Waived DH. No arraignment date set. |
| Granville | Smith, Gregory Delante | 16848-509 | 9/13/21 sentencing |
| Granville | Stallings, Ashiri | 70854-018 | 7/28/21 SRV hearing |
| Granville | Abney, Cruz Costilla | 66624-056 | 7/29/21 Motion Hearing Raleigh |
| Granville | Autry, Darrius | 66950-056 | 8/4/2021 Notice of Writ to Produce - Raleigh |
| Granville | Bright, Manweld Shontae | 66913-056 | 8/23/21 Sentencing hearing |
| Granville | Bryant, Daishon Marquise | 67419-056 | 9/7/21 term arraignment in Raleigh |
| Granville | Byers, Antonio Demond | 16523-058 | 8/4/21 arraignment |
| Granville | Byers, Antonio Demond | 16523-058 | 8/4/21 arraignment |
| Granville | Campos-Arrollo, Ruben | 22699-057 | Notice of Attorney appearance filed 7/21/21 |
| Granville | Christos, Gregory Anthony | 56382-177 | 8/17/21 resentencing in Wilmington |
| Granville | Coward, Treveris | 39361-509 | 10/4/21 arraignment Raleigh |
| Granville | Daniels, Gregory | 04795-509 | 8/23/21 sentencing |
| Granville | Davis, Christopher Lee | 22787-058 | 8/6/21 Arraignment Wilmington Courtroom 160 |
| Granville | Davis, Howard | 19020-057 | DH 7/21/21 - held |
| Granville | Dayton, Gregory | 41339-509 | 8/23/21 arraignment Raleigh |
| Granville | Driver, Cody | 41044-509 | CJA 23 Financial Affidavit filed 6/29/21 |
| Granville | Dyson, Laurence Joseph | 24318-509 | 10/4/21 arraignment Raleigh |
| Granville | Gortarez-Jimenez, Luis Javier | 66365-056 | Amended Judgement of 33 months signed on 6/30/21 |
| Granville | Haight, Marlon Jajuan | 30020-007 | 9/14/21 Arraignment |
| Granville | Hammonds, James Allen | 67047-056 | 10/4/21 Sentencing Raleigh |
| Granville | Hucks, Michael | 16461-509 | 9/7/21 term sentencing in Raleigh |
| Granville | Jackson, Alex Ali | 14754-509 | Objections to Presentence report filed 7/13/21 |
| Granville | Johnson, Robert | 48411-509 | 9/7/21 Arraignment Raleigh |
| Granville | Jordan, Johnny Earl | 34763-509 | Motion for Forfeiture of Property filed on 6/29/21 |
| Granville | Jordan, Johnny Earl | 34763-509 | 9/7/21 sentencing |
| Granville | Kerrin, Anthony Sheridan | 66808-056 | Motion for Extension of time to file pretrial motions filed 7/6/21 |
| Granville | King, Alexander | 34839-509 | 3/22/21 waived DH.  Arraignment not set. |
| Granville | Maieritsch, Corey Dean | 03044-509 | 8/23/21 Sentencing Raleigh |
| Granville | Manning, Devon | 41244-509 | 8/6/21 Arraignment Wilmington Courtroom 160 |
| Granville | Mitchell, Elton Tyler | 65133-056 | Terminate Revocation Hearings to be reset with 5:21-CR-261 for sentencing filed 7/12/21 |
| Granville | Mitchell, Keyante | 27727-509 | 9/20/21 Arraignment Raleigh |
| Granville | Mitchell, William | 29315-509 | 9/20/21 Arraignment Raleigh |
| Granville | Morales-Guardado, Candido E | 33037-509 | Objections to Presentence report filed 7/14/21 |
| Granville | Myles, Antoine | 23728-056 | 8/11/21 Remand sentencing hearing Wilmington courtroom 160 |
| Granville | Perri, Sy Arthur | 55525-056 | Committed to custody of BOP for 24 months filed on 6/24/21 |
| Granville | Phillips, Bernard | 27725-509 | 9/20/21 Arraignment Raleigh |
| Granville | Pineda, Eric | 34371-509 | 9/7/21 Arraignment Raleigh |
| Granville | Purvis, Craig Randall | 37241-509 | 8/23/21 Arraignment reset Raleigh |
| Granville | Robinson, Jasmele Shywan | 62426-056 | Count 1 - 60 months Count 2- 105 months and shall run consecutive filed on 10/28/20 |
| Granville | Robinson, Jasmele Shywan | 62426-056 | Committed to custody of BOP for 24 months filed on 10/30/20 |
| Granville | Rodgers, Torrick Johntrelle | 55575-056 | 8/24/21 Resentencing New Bern Courtroom |
| Granville | Stewart, Jallani | 38878-509 | 7/14/21 DH - held |
| Granville | Walker, Leonard James | 36183-509 | Order granting motion for extension of time to file pretrial motions signed on 7/22/21 |
| Granville | Webb, Lemont Jerrone | 59341-056 | 8/11/21 sentencing Wilmington |
| Granville | Webb, Reginald | 37988-509 | 8/2/21 Arraignment Raleigh |
| Granville | Weeks, Michael Tomario | 66665-056 | 9/20/21 Sentencing Raleigh |
| Granville | Wilkins, Robert Hughes | 66323-056 | Order granting motion for extension of time signed on 7/22/21 |
| Granville | Williams, Anthony Walter | 02823-088 | Arrest Warrant returned executed on 5/20/21, entered: 6/8/21 |
| Granville | Williams, Dwight Dell | 14054-509 | 8/23/21 term sentencing |
| Granville | Willie, Joseph | 34944-509 | 9/14/21 Arraignment before Magistrate Judge Robert B. Jones Jr. |
| Wake | Locklear, Tonyal | 29435-057 | not set |
| Wake | Alarcon, Bobby Jr | 34196-180 | not set |
| Wake | Best, Corey Ramon | 23850-056 | 9/7/21 sentencing |
| Wake | Chavis-Johnson, Kauri | 44657-509 | not set |
| Wake | Daniels, Quarmaine Devonta | 62810-056 | not set |
| Wake | England, Milton Jamal | 62757-056 | not set |
| Wake | Godines-Bautista, Efrain | 26044-408 | not set |

# DURHAM APPENDIX 45

| | | | |
|---|---|---|---|
| Wake | Guerrero-Tiscareno, Herminio | 07896-180 | 10/4/21 term |
| Wake | Hasanova, Maryam | 52737-509 | not set |
| Wake | Massenburg, Kendrick Antonio | 50864-056 | not set |
| Wake | Parker, Carl Edwin | 63318-056 | not set |
| Wake | Pulley, Antwione Jerome | 54000-056 | not set |
| Wake | Royster, Rajuan | 66914-056 | not set |
| Wake | Santibanez-Pelayo, Victor Alfonso | 51715-056 | not set |
| Wake | Zavaleta-Castro, Loreto | 17997-379 | 10/4/21 term |
| Wake | Covington, Joel Matthew | 51512-056 | not set |
| Wake | Derek, Gower | 52491-509 | not set |
| Wake | Mcelrath, Nicholas | 49790-509 | not set |
| Wake | Horton, William | 36216-056 | 9/7/2021 |
| Wake | Durham, Frankie | 53102-509 | waived dh 7/7 |
| Wake | Gardner, Tiera Nicole | 03481-509 | Sentencing9/7 |
| Wake | Jenkins, Traquan | 53097-509 | DH 7/7/ |
| Wake | Perez-Onan, Elvin | 42392-509 | arraigned 6/23 |
| Wake | Salvador-Morales, Jorge | 52833-509 | Dh held 7/21 |
| Wake | Smith, Anthony Javon | 64365-056 | 7/23 rec'd time served |
| Wake | Speight, Jimmy Junior | 50433-509 | Arraignment 9/7 |
| Wake | Taylor, Chadwick | 35622-509 | No date set |
| Wake | Taylor, Rashad Jerrod | 29103-509 | Arraignment 9/20 |
| Wake | Vaught, Joseph Anthony | 63297-056 | ASR for resentencing - No date |
| Wake | Koonce, Sherry | 50297-509 | 9/7 term |
| Wake | Shepard, Jourden Tairee | 29519-509 | 10/12/2021 |
| Wake | Hunt, Shannon Michael | 55688-509 | not set |

DURHAM APPENDIX 46

July 27, 2021

Chris Budnick
MSW, LCSW, LCAS, CCS
Executive Director

**BOARD OF DIRECTORS**
Dr. Leon Woodruff, Chair

Brad Turlington, Vice-Chair

Mark Ezzell, Treasurer

Evelyn Booker
Secretary

Caitlin Clinard

Jeb Jeutter

Ashley Jones

Angel Menendez

Anita Neville

Mick Quinlin

Mark Steward

Chris Valauri

Barbara Williford

**BOARD OF TRUSTEES**
Dr. David Fitzpatrick, Chair

Jerry Weaver, Vice-Chair

Scott Mauzy, Treasurer
& Secretary

Dr. Bob Bilbro
Immediate Past Chair

Richard Gaylord

Bob Goodale

Barbara Goodmon

Susanne Hayes

Re: Frankie Durham
DOB: 8/27/1987

To Whom It May Concern,

This letter is in reference to Mr. Frankie Durham's acceptance in our long-term recovery program at Healing Transitions. Healing Transitions (formerly The Healing Place of Wake County), is a homeless shelter with a long-term 12-Step recovery program attached. The program usually takes 12-18 months to complete.

While here, Mr. Durham will be responsible for attending regular Recovery Dynamics classes and 12-step meetings daily. Feel free to contact me at (919)-865-2557 X233 or jelk@healing-transitions.org

Respectfully Submitted,

Jamie Elk
Recovery Outreach Specialist
Healing Transitions

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:21-CR-229-D

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | GOVERNMENT'S RESPONSE |
| | ) | IN OPPOSITION TO |
| v. | ) | DEFENDANT'S MOTION FOR |
| | ) | RELEASE |
| FRANKIE ALLAN DURAHM | ) | |
| | ) | |

The United States of America, by and through the United States Attorney for the Eastern District of North Carolina, files the following Response in Opposition to the Defendant's Emergency Motion for Release and in the Alternative for Stay of Transfer. [D.E. 18].

Frankie Allan Durham ("Defendant") was charged by indictment with being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924. On July 7, 2021, Defendant executed a waiver of his detention hearing. [D.E. 17]. As a result, Defendant was ordered detained pending trial.

Defendant now asks this Court to reopen the issue of detention based on two factors Defendants says was not known to him at the time of his waiver: (1) acceptance into a treatment facility; and (2) his transfer by the United States Marshals Service (USMS) to Tallahatchie County Correctional Facility (TCCF) in Tallahatchie, Mississippi. [D.E. 18 at 1]. For the reasons that follow, Defendant's motion should be denied.

## FACTUAL AND PROCEDURAL SUMMARY

On November 5, 2020, Officer Jeffrey Demarest with the Wilson Police Department

(WPD) was on routine patrol when he got behind a vehicle that made several left turns in a row, which he thought to be odd.   Officer Demarest also noted that the driver failed to use the turn signal on at least one occasion while making the turns.   He ran the license plate which returned lost or stolen.   Consequently, he decided to conduct a traffic stop on the car.

On approach, the driver – later identified as Defendant – yelled out the window, "why you light me up?".   Officer Demarest explained that the plates returned lost or stolen, to which the driver replied, "they're not stolen they are my tags."   Defendant was the sole occupant of the vehicle.   Officer Demarest then asked Defendant for his driver's license, but he stated he did not have one and gave the officer his identifiers.   Officer Demarest noted that Defendant appeared to be extremely nervous, observing his chest moving as he was breathing heavily.   Based on Defendant's odd driving behavior and nervousness, Officer Demarest requested a K9 unit to report to scene.

While the K9 unit was doing an open-air sniff around the car, Officer Demarest asked Defendant to step out of the vehicle.   The officer was able to find Defendant in government databases which showed Defendant's license was suspended and was on active state probation. Officer Demarest asked Defendant if he was on probation, and he admitted he was.   DURHAM also spontaneously stated "I don't know what is in that truck."

The K9 did not give a positive alert for the presence of narcotics in the vehicle.   However, while walking around the vehicle, Officer Demarest saw a glass pipe in plain view laying on the driver's seat where Defendant had been sitting.   In Officer Demarest's training and experience, he believed the pipe is used to smoke methamphetamine.    Based on this, the officer conducted a warrantless search of the vehicle.   The K9 handler did not want to let the K9 in the car due to the suspected presence of methamphetamine based on the discovery of the pipe.   However, K9

Officer Emory found a small bag containing approximately 3 grams of a crystal-like substance believed to be methamphetamine lying on the driver's side floorboard.

Under the driver's seat, Officer Demarest found a SCCY CPX-2 9mm handgun with an extended magazine loaded with ammunition. Elsewhere in the car, officers found 12-gauge shotgun shells and a small clear bag of 9mm ammunition in the center console, along with a set of digital scales. Defendant denied knowledge of all contraband in the vehicle.

Defendant is a convicted felon, having been most recently convicted of Possession with Intent to Distribute a Schedule II controlled substance, for which he received a term of imprisonment of 6-17 months. [D.E. 15 at 4]. He was on probation for this conviction at the time of the instant offense.

### Indictment

On June 3, 20201, a grand jury sitting in the Eastern District of North Carolina issued an indictment charging the Defendant with possession of a firearm by a felon. [D.E. 1]. An initial appearance occurred on July 1, 2021. [D.E. 9].

### Pretrial Services Report

The pretrial services report indicated that the Defendant had multiple prior convictions, including possession of heroin (2016), possession with intent to manufacture, sell, or deliver a Schedule II controlled substance (twice in 2020). [D.E. 15 at 3-4]. He has misdemeanor convictions for simple worthless check (2016), possession of drug paraphernalia (2016, 2017, 2018), and larceny (2018). [D.E. 15 at 3-4].

The Defendant had multiple probation violations, including probation violations in 2019 for testing positive for drug use, committing new criminal conduct, failing to comply with substance abuse treatment, and failure to satisfy court costs. Id. at 5.   Prior violations in 2017 include absconding from supervision, failing to satisfy court fees, testing positive for drug use, and failing to complete community service.   Id. at 4.

The pretrial services report indicated that the Defendant declined to discuss his mental health and substance abuse.   Id. at 3.

The pretrial services report recommended detention based on several factors, including:

- Assessment of nonappearance
  - Lack of property and financial ties
  - Substance abuse history
  - Criminal activity while under supervision
  - History of absconding while under supervision

- Assessment of danger
  - Nature of instant offense
  - Prior arrests and convictions
  - Substance abuse history
  - Criminal activity while under supervision
  - Allegedly committing the instant offense while under supervision

[D.E. 15 at 5-6.

On July 29, 2021, Defendant filed the Motion for Release and in the Alternative for Stay of Transfer.   [D.E. 18].   The Defendant's motion states the release plan is to Healing Transitions, a substance abuse treatment program.   Id. at 3.

## **LEGAL STANDARD**

### ***Standard Regarding Request for Immediate Release***

The Bail Reform Act provides that a defendant shall be detained if a judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the defendant as required or the safety of any other person and the community. 18 U.S.C. § 3142(e).

The Court's decision is guided by the factors set forth in 18 U.S.C. § 3142(g). These factors are (1) "the nature and circumstances of the offense charged;" (2) "the weight of the evidence against the person;" (3) "the history and characteristics of the person" including, among other factors, family ties, employment, financial resources, past conduct, criminal history, and whether the person was on release pending trial; and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g).

Unless § 3142(e)'s rebuttable presumption applies, the burden lies with the Government to demonstrate either (1) by clear and convincing evidence that "no conditions other than detention will reasonably assure the safety of any other person and the community," *United States v. Simms*, 128 F. App'x 314, 315 (4th Cir. 2005) (citing 18 U.S.C. § 3142(f)(2)); or (2) by a preponderance of the evidence that detention

is necessary to reasonably assure the appearance of the defendant at future court proceedings, *United States v. Stewart*, 19 F. App'x 46, 48 (4th Cir. 2001).

After a defendant has been ordered detained prior to trial, the "[detention] hearing may be reopened . . . at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a *material bearing* on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community." 18 U.S.C. § 3142(f) (emphasis added).

When a Defendant moves to reopen a detention hearing, the Court may deny the Defendant's motion without holding a new detention hearing if: (1) there is no new information that was "not known to the movant at the time of the [original] hearing," or (2) the information would not have a "*material bearing* on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community." 18 U.S.C. § 3142(f) (emphasis added).    Under § 3142(f), the court may temporarily release a detainee from custody if "the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i).

## ARGUMENT

First, the Government respectfully requests that the Court deny the Defendant's motion for release to a treatment facility.    Defendant has failed to comply with treatment programs in the past, as recent as 2020.    Specifically, on

November 5, 2020, Defendant's state probation was revoked, in part, because he failed to comply with substance abuse treatment.   [D.E. 15 at 5].

Second, the USMS has discretion on where to house pretrial inmates and, in any event, the fact that Defendant is pending transfer to TCCF does not have a "*material bearing* on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community." 18 U.S.C. § 3142(f) (emphasis added). Nor are the circumstances described in the Defendant's motion a "compelling reason" requiring release. 18 U.S.C. § 3142(i)

## I.   THE COURT SHOULD DENY DEFENDANT'S REQUEST FOR RELEASE TO A TREATMENT PROGRAM BECAUSE HE HAS FAILED TO MAKE THE REQUIRED SHOWING UNDER 18 U.S.C. §§ 3142 OR 3143.

### A.   Factors Under the Bail Reform Act

The Defendant is charged with a serious firearm offense.   The evidence shows that the Defendant was on probation for a felony drug offense when he was found in a traffic stop with a gun and drugs. This poses a serious danger to the community.

Second, the evidence against the Defendant is overwhelming. The evidence includes a traffic stop in which the Defendant was found in possession of a loaded firearm with an extended magazine under the driver's seat with drug paraphernalia in plain view.

Third, the Defendant's history and characteristics show that he is a significant danger to the community. He has prior convictions for drug distribution.   [D.E. 15].

He also has multiple violations of probation, including violations for new criminal conduct, testing positive for drug use, and failing to complete a substance abuse assessment. (D.E. 15 at 5).

> **B.    The Defendant has Failed to Show that his Pending Transfer to TCCF Requires a Reopening of the Detention Issue and the Immediate Release of the Defendant or the Stay of his Transfer.**

Defendant asserts that the issue of detention should be reopened, in part, because he was not aware that he would be transferred to TCCF.   However, the place of a Defendant's pretrial detention is not a factor under the Bail Reform Act for whether a defendant should be detained.   Moreover, the Defendant does not cite a case in which a court released a defendant merely because the defendant is being transferred to a correctional facility outside of the district where he is being prosecuted.

## II.    THE COURT DOES NOT HAVE JURISDICTION TO ORDER A PARTICULAR PLACE OF PRETRIAL CONFINEMENT.

The Defendant asks this Court to direct the USMS to stay his transfer to TCCF, which is essentially a request to mandate Defendant's place of pretrial detention.   However, that function is appropriately left to the USMS.   Section 0.111(o) of Title 28 of the Code of Federal Regulations clearly requires that the Director of the Marshals Service exercise his judgment when selecting which non-federal facilities will house federal prisoners.   In carrying out its duty, the Director of the USMS is broadly authorized to acquire "adequate and suitable detention space, health care and other services and materials required to support prisoners under the

custody of the U.S. Marshal who are not housed in Federal facilities." 28 C.F.R. §

0.111(o). <u>See</u> <u>United States v. Valdez</u>, 2014 WL 4103204 (W.D. La. Aug. 13, 2014)

(holding that "Section 0.111(o) gives the Marshals Service absolute direction with

regard to the housing of prisoners"). The grant of this authority is open-ended.  It

does not limit or guide the selection of a facility in any way so long as the space is

adequate, suitable, and meets minimum compliance criteria.  <u>See</u> 18 U.S.C. §

4013(c).  This open-ended authority recognizes the Marshals Service's need to weigh

concerns of expense, administration, payment, and access to the premises.

Moreover, "[t]he Director of the United States Marshals Service shall direct and

supervise all activities of the U.S. Marshal Service including:

> Sustention of custody of Federal prisoners from the time of their arrest
> by a marshal or their remand to a marshal by the court, until the
> prisoner is committed by order of the court to the custody of the Attorney
> General for the service of sentence, otherwise release form custody by
> the court, or returned to the custody of the U.S. Parole Commission or
> the Bureau of Prisons.

28 C.F.R. § 0.111(k).

"Courts will not interfere with the U.S. Marshal's exercise of discretion as

where to place a federal pretrial detainee absent extraordinary circumstances."

<u>Marlow v. United States Marshal Service</u>, 2021 WL 2292244 (E.D.Tn. Jun. 4, 2021);

<u>see</u> <u>also</u> <u>United States v. Bingham</u>, 2016 WL 738045 (E.D. Mi. Feb. 25, 2016) (noting

that the "housing of federal prisoners pending court proceedings is within the

discretion of the U.S. Marshals Service and [the] Court will not interfere with that

discretion, absent extraordinary circumstances").

The USMS's authority to exercise its judgment on where to house federal pretrial inmate should not be disturbed because it is in the best position to understand the various factors that go into where to house pretrial inmates. This Court should decline Defendant's invitation to supplant its judgment for that discretion which is conferred upon the USMS.

## <u>CONCLUSION</u>

The Defendant is a convicted felon who would endanger the community if released. The information proffered by the Defendant does not qualify as new information having a "material bearing" on the Court's prior decision that the Defendant must be detained pending trial. 18 U.S.C. § 3142(f). Nor is there a "compelling reason" that temporary release is required. 18 U.S.C. § 3142(i). The Government respectfully requests that the Court deny the Defendant's motion.

Additionally, the Court is without jurisdiction to order the USMS to house Defendant at a particular facility.

Respectfully submitted, this the 30th day of July, 2021.

G. NORMAN ACKER, III
Acting United States Attorney

BY:    /s/ Robert J. Dodson
ROBERT J. DODSON
Assistant United States Attorney
Criminal Division
150 Fayetteville Street, Suite 2100
Raleigh, NC 27601
Telephone:   (919) 856-4054
Facsimile:   (919) 856-4487
Email: robert.dodson@usdoj.gov
NC Bar No. 41210

## **CERTIFICATE OF SERVICE**

I certify that I have on this 29th day of July, 2021, served a copy of the

foregoing upon Defendant by CM/ECF as follows:

David E. Wicclair
Assistant Federal Public Defender

/s/ Robert J. Dodson
ROBERT J. DODSON
Assistant United States Attorney
Criminal Division
150 Fayetteville Street, Suite 2100
Raleigh, NC 27601
Telephone:   (919) 856-4054
Facsimile:    (919) 856-4487
Email: robert.dodson@usdoj.gov
NC Bar No. 41210

```
                        UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NORTH CAROLINA
                            WESTERN DIVISION


_____  )
                                 )
UNITED STATES OF AMERICA,        )
                                 )
              vs.                )    CASE NO. 5:21-CR-229-D-1
                                 )
                                 )
FRANKIE ALLAN DURHAM,            )
                                 )
              Defendant.         )
_____  )




                        MONDAY, AUGUST 2, 2021
                            MOTION HEARING
                    HELD IN RALEIGH, NORTH CAROLINA
                BEFORE THE HONORABLE JAMES C. DEVER III
                      UNITED STATES DISTRICT COURT
```

APPEARANCES:

On Behalf of the Government:

**ROBERT J. DODSON, Assistant U.S. Attorney**
**U.S. Attorney's Office**
**150 Fayetteville Street, Suite 2100**
**Raleigh, North Carolina  27601**

On Behalf of the Defendant:

**DAVID E. WICCLAIR, Esquire**
**Federal Public Defender's Office**
**150 Fayetteville Street, Suite 450**
**Raleigh, North Carolina  27601**


```
                  MICHELLE A. McGIRR, RPR, CRR, CRC, RMR
                         Official Court Reporter
                       United States District Court
                          Raleigh, North Carolina
```

2

1                           I N D E X

2       **WITNESS:**

3

4                       Jaime Elk

5

6       **EXAMINATION:**                                    **PAGE**

7
                        Direct Examination by Mr. Wicclair      8
8                       Cross-Examination by Mr. Dodson         13
                        Redirection Examination by Mr. Wicclair 18
9

10

11      **WITNESS:**

12
                        Detective James Holmes
13

14      **EXAMINATION:**

15
                        Direct Examination by Mr. Dodson        20
16                      Cross-Examination by Mr. Wicclair       24
                        Redirect Examination by Mr. Dodson      27
17

18

19

20      **DEFENDANT'S EXHIBITS:**

21

22      No.                                         In Evid.

23      2 and 3                                          19

24

25                           *   *   *

```
 1                    (Monday, August 2, 2021)

 2                    P R O C E E D I N G S

 3

 4  (The defendant, Frankie Allan Durham, escorted into the courtroom at

 5                         11:19 a.m.)

 6                  (Open Court at 11:30 a.m.)

 7           THE COURT:  We're here on a motion that the defendant,

 8  Frankie Durham, filed seeking to reopen the issue of detention to

 9  stay his transfer.

10           As I understand it, nobody is going to Mississippi so the

11  transfer issue is moot.

12           MR. WICCLAIR:  That's correct, Your Honor.

13           THE COURT:  Okay.  So I got the Government's response.  I

14  got the defense motion.

15           Mr. Durham has not been successful in treatment and so

16  you want him out of custody to go to treatment, is that the gist of

17  it?

18           MR. WICCLAIR:  Your Honor, the gist of it is that he has

19  not ever had intensive inpatient treatment.  The only treatment that

20  he has that -- that Mr. Dodson alluded to in the motion was a

21  call-in treatment in 2020 during the coronavirus.  He was not

22  successful during that tasked state treatment, but what we're

23  proposing to your Honor as a release plan -- and which we have a

24  witness present from Healing Transitions -- is vastly different and

25  vastly more intensive.
```

1          So we would submit that that is an appropriate release

2     plan.

3          THE COURT:  Mr. Dodson.

4          MR. DODSON:  Your Honor, we oppose any release.

5          As the Court pointed out, he did violate his pretrial

6     release; and it appears to me from the pretrial services report, it

7     was a violation of both probation and post-release supervision.  But

8     in any event, he did violate that by failing to complete this

9     program.

10         But in addition to that, he has several other failures on

11    supervision, including committing new criminal conduct, including

12    tested positive for drug use, including failure to satisfy court

13    fees.  He has at least four failures to appear as recent as, I

14    think, probably 2018 based on the case -- the case numbers.

15         So, you know, I'm prepared to argue the whole case, but

16    in terms of just the release to this treatment program, he has

17    multiple recent failures on supervision.  One of which, again, which

18    is very concerning, is the new criminal conduct piece.  And, in

19    fact, he was on post-release and probation, it appears, at the time

20    he is alleged to have committed this offense where he had a firearm

21    with an extended magazine, 3 grams of methamphetamine, ammunition

22    and drug paraphernalia.

23         He is a danger to the community.  We do not believe that

24    this treatment program would be sufficient to mitigate that risk.

25    It doesn't appear to be a locked facility.  It appears he can come

1  and go.  It's described in the Defense Exhibit 2 as a homeless

2  shelter.  So I don't believe it is sufficient to mitigate the risk

3  of danger that he poses.  And he has shown a propensity to violate

4  the very hallmark conditions this Court could impose to mitigate

5  that risk.

6          And for those reasons, your Honor, we would oppose his

7  release on those conditions.

8          MR. WICCLAIR:  Your Honor, if I may briefly respond.

9          First, with regard to the treatment facility and the fact

10  that it's not a lock-down facility, that is true.  However, they do

11  allow and have allowed and would -- we would be asking for it in

12  this case, allowing electronic monitoring to be set up in the

13  facility to ensure that Mr. Durham stays at the facility.

14          I would also be asking as far as --

15          THE COURT:  How does that ensure he stays there?  It just

16  ensures that it would trace where he went; but, I mean, he's not

17  really shown that he's very trustworthy, right.  I mean, electronic

18  monitoring just basically says you can see where he's going, but he

19  can walk out.

20          MR. WICCLAIR:  Absolutely, he can walk out.  And, I mean,

21  as part of the program, the first month, you're not allowed to walk

22  out.  He's going to be required, if your Honor would see fit, to

23  sign a release form --

24          THE COURT:  But not allowed by virtue of an honor system.

25  I mean, at the end of the day, it's about whether the Court trusts

1  him.

2          MR. WICCLAIR:  I mean, that's correct -- trusts him to

3  understand -- I mean, I would suggest, your Honor, trusts him to

4  understand that there's going to be a whole lot of pain coming his

5  way if he doesn't follow through with the protocols and the

6  requirements.

7          And, your Honor, what I'm suggesting to you overall is

8  that Mr. Durham's record, since the time he was 27, is consistent

9  with that of a drug addict.  He has not had an opportunity to have

10 an intensive --

11         THE COURT:  Not just a drug addict.  There have been

12 crimes, right.  People -- you don't go to prison for being a drug --

13 we're not here today because of his drug addiction.  It's because of

14 his criminal behavior --

15         MR. WICCLAIR:  I understand.

16         THE COURT:  -- right.  So it's not -- it would be -- it's

17 incorrect to say that that's -- that's what we're here for.  It's

18 not that.

19         MR. WICCLAIR:  I guess what I'm trying to say -- and

20 probably not very well, your Honor -- is I think the root cause of

21 his criminality is a substance abuse issue.  And that this is an

22 opportunity, at least as I see it, to give Mr. Durham the ability to

23 get clean.  I, your Honor, believe -- and I've seen this with people

24 who have records very much commensurate with Mr. Durham's -- that

25 this program works.  This program gives people the opportunity to

```
1    get clean and stay clean and then reintegrate with society.

2              I would submit to your Honor that from the time that he

3    was zero until 27, he did not have an arrest history.  And I'm not

4    saying that that's outstanding or that should be expected; however,

5    that's very different than a lot of people who step into this

6    courtroom who have had histories starting from teenage years.

7              What's clear, your Honor, when he was 27, he developed a

8    heroin addiction.  From that time, his record unfortunately became

9    consistent with someone who is using and doing anything to get their

10   next high.  I would submit that Healing Transitions will assure that

11   he does not do anything to seek that next high because they have a

12   plan in place and a good one.

13             And I would submit, your Honor, that -- Ms. Elk is here

14   to talk about that program, to answer any questions that maybe you

15   had about steps that may be taken to ensure that he remains and if

16   he doesn't, that he's immediately apprehended.

17             So I would submit, your Honor, that despite the fact that

18   he has a record, a criminal record, he has committed crimes, that

19   this is an appropriate release plan here today.

20             THE COURT:  All right.  I'll hear your witness.

21             MR. WICCLAIR:  Your Honor, the defense calls Ms. Jamie

22   Elk.

23             THE CLERK:  Ma'am, you can come to the witness stand.

24   If you'll please remove your mask.

25             Place your left hand on the Bible and raise your right.
```

8

```
 1   State your name for the record.

 2            THE WITNESS:  Jamie Elk.

 3                         JAMIE ELK

 4            having been duly sworn, testified as follows:

 5            THE WITNESS:  Yes.

 6            THE CLERK:  Thank you.  You can have a seat.

 7            Would you like water?

 8            THE WITNESS:  Yes, please.

 9            THE COURT:  Good morning, Ms. Elk.

10            THE WITNESS:  Good morning.  How are you.

11            THE COURT:  Once you get your water, Mr. Wicclair is

12   going to have some questions for you, then Mr. Dodson is going to

13   have some questions for you.

14            THE WITNESS:  Thank you.

15            THE COURT:  Please try and keep your voice up so we can

16   hear what you have to say.

17            THE WITNESS:  Yes, sir.

18            THE COURT:  You may examine the witness.

19            MR. WICCLAIR:  Thank you, your Honor.

20                    DIRECT EXAMINATION

21   BY MR. WICCLAIR:

22       Q.   Good morning, Ms. Elk.

23       A.   Good morning.

24       Q.   Ms. Elk, would you tell His Honor a little bit about the

25   organization that you work --
```

DURHAM APPENDIX 66

9

1       A.    Absolutely.  We are a long-term residential program for

2   those who have a substance use disorder.  The program usually takes

3   anywhere from nine to 18 months to complete.

4            It's broken down into four different areas.  The first

5   two phases of the program, called Met I and Met II.  In Met I, that

6   portion of the program, an individual is responsible for recovery

7   dynamic classes.  Teaches them about the substance use disorder.

8   They're engaged to a 12-step program.  They are around others who

9   suffer with the same substance use disorder.

10           In that time, he will be required to stay on property all

11  the time.  Unable to leave the program unless gone to a walk around

12  Dix Park with an older person in the program.  Like I said, he'll be

13  involved in many 12-step classes -- meetings.

14           Met II is a lot of the same.  Still recovery dynamics,

15  still 12-step meetings.  Working a little bit on property with the

16  other participants, teaching them how to get up and be productive

17  without a substance in their system.

18           Again, he's unable to leave the property without the

19  supervision of an elder person in the program, which is part of

20  giving back in teaching the people that are coming in how to build

21  networks and how to engage with people so that when they do

22  transition out of the program, they have built this recovery

23  community which will help them be successful in the recovery.

24           Both those portions of the program last a month.  Once

25  they get to CTR I, which is the longest and hardest part of our

1   program -- that's about six months long.  In that portion of the

2   program, he'll be required to show up regularly to a job on property

3   that's going to be chosen by his peers.  It's also a peer-run

4   program.  When I say peer-run, I mean he's addressed on attitudes

5   and behaviors, things he may not have seen within himself that

6   others can see.  Address him on it.  Allow him the opportunity to

7   work on those defects.  And they go to community, they show up for

8   classes, they're involved in many 12-step meetings.  They're

9   required to get a sponsor and work the 12 steps.

10          And once completing that portion of the program, they

11  move into CTR II, which is the final stage.  In that portion of the

12  program, they give back to the program.  They do a commitment.  It

13  can be a 30, 60, or a 90-day commitment in any of the areas they

14  worked in.  We have buildings and grounds, kitchen, planning room,

15  which is a very important part of the program.

16          Once completing that commitment, they are given the

17  opportunity to find a job and -- before they're able to transition

18  out into the community.

19      Q.    Now, Ms. Elk, has Mr. Durham been interviewed and

20  accepted into this program?

21      A.    Yes.  He completed the screening process with David Batz,

22  [phonetic] the planning rooms peer mentor and he has been accepted

23  and approved.

24      Q.    If he were released here today by His Honor, would he

25  have a bed available?

1    A.    Yes.  I checked this morning, there is a bed open waiting

2    for him.

3    Q.    Okay.  And would he have the ability to be placed on to

4    some type of electronic monitoring device while residing at Healing

5    Transitions?

6    A.    Yes.  That's something we see often.

7    Q.    And would you explain the process by which you work with

8    U.S. Probation or state agencies to ensure that the monitoring

9    device is installed?

10    A.    Yeah.  Once the individual shows up, of course, they

11    would sign a release of information that would give us availability

12    to communicate with the probation officer.  The monitor is placed on

13    the individual and, you know, they would charge it, keep it

14    monitored.  The probation officer could call at any time, could show

15    up at any time and find out anything they need to know about

16    their -- what's going on.

17    Q.    And if that person does call -- if the probation officer

18    calls and the release is signed, you are able to give them all

19    information about the progression of the participant?

20    A.    Absolutely, yeah.  There is a place in the computer where

21    that release of information -- that anybody that has access to those

22    files, understands and knows that they're able to give information

23    to this person.

24    Q.    Now, Ms. Elk, I've spoken with you briefly about Mr.

25    Durham and his substance abuse history, right?

**DURHAM APPENDIX 69**

12

1      A.    Yes, sir.

2      Q.    I've told that you he is a heroin addict and he has been

3    a substantial addict since age 27.

4      A.    Yes, sir.

5      Q.    And that today he's 33.

6      A.    Um-hum.

7      Q.    And I believe we may have already gone through this, but

8    he has some fairly substantial criminal convictions over the past

9    six years.

10      A.    Yes, sir.

11      Q.    Having heard his history, his drug history, having heard

12    the convictions of what he's done seeking that next high, does that

13    give you pause as to his ability to be successful in the Healing

14    Transition program?

15      A.    It does not.  It sounds like something that -- that

16    they're decisions that are made under the influence of a substance.

17    So it's not something -- it's -- I don't want to say it's normal,

18    but he's -- yeah.  No, it does not give me pause.

19      Q.    Have you seen other people who have records similar to

20    Mr. Durham who have been successful in these circumstances?

21      A.    Yes.  More so than not.

22      Q.    And just to be clear, you stated that during the first

23    two-month portion of this program, Mr. Durham would not be allowed

24    out without a sponsor?

25      A.    That's correct.

DURHAM APPENDIX 70

1      Q.    And he would be able to communicate with his probation

2  officer to alert them as to when he would be off the premises

3  briefly?

4      A.    Yes, sir.  He can get an idea of what his schedule is

5  going to look like and communicate that with his probation officer.

6  Most probation officers are familiar with our program.

7      Q.    Okay.

8            MR. WICCLAIR:  Your Honor, I do not have any further

9  questions.

10           THE COURT:  Cross-examination.

11           MR. DODSON:  Thank you, your Honor.

12                           **CROSS-EXAMINATION**

13  BY MR. DODSON:

14      Q.    Good morning, ma'am.

15      A.    Good morning.

16      Q.    Thank you for being here today.  I just have a few

17  questions for you.

18            How many patients do you have approximately in the

19  men's -- at the men's campus.

20      A.    Right now at the men's we have a total of 143 beds.

21      Q.    And it's not a locked facility, correct?

22      A.    It is not.

23      Q.    And should someone -- should one of the patients enrolled

24  in the program, should they decide to leave in violation of the

25  program's rules, you don't try to physically stop them, of course;

1    is that correct?

2          A.    There would be a conversation if a person was showing

3    interest in leaving.  The community is very good with convincing a

4    person to stay.  We do understand that there are emotions that are

5    involved in staying in a program and changing yourself and your

6    behaviors and so our community of men, especially, are very caring.

7    I've seen many times where they will stop a guy and try to get them

8    to stay.  Yeah.

9          Q.    But, of course, after all of that, if the person still

10   decides they want to exit the program, you don't have security or --

11   you wouldn't try to physically stop the person from leaving after

12   all of the intervention tactics that you use?

13         A.    It is a willingness program.

14         Q.    Okay.  So that's a no?

15         A.    Yes.

16         Q.    So the answer is no?

17         A.    Yes.

18         Q.    Do you allow people to come visit patients on campus like

19   family or friends?

20         A.    We only allow them with a -- they have to put in a plan

21   of action so they have to give detail on who's coming and what day

22   they're coming.  Saturdays and Sundays they might be able to have an

23   outside visit for 20 minutes.

24         Q.    And are those visits monitored?

25         A.    They're out with others in the community.

```
 1          Q.    So I guess it's peer-monitored for lack of a better word?
 2          A.    Yes.
 3          Q.    There's no staff that monitors the visits?
 4          A.    No, sir.
 5          Q.    And they're not monitored by any kind of surveillance
 6    cameras or anything like that?
 7          A.    No, sir.
 8          Q.    They're not audio recorded or anything?
 9          A.    Oh, no, sir.
10          Q.    What about telephone calls.  Are they allowed to have
11    phone calls?
12          A.    In the first 30 days they can have, I think, one call a
13    week outside.  In Met II, I think they might get -- I think two
14    calls -- two calls outside besides to their sponsor; but once they
15    get to CTR I, they'll be able to use the phone.  The phone
16    privileges are for building a network, speaking to your sponsor,
17    things like that.
18          Q.    Can they also talk with family and friends?
19          A.    They can.
20          Q.    Are those calls monitored by the staff?
21          A.    No, sir.
22          Q.    Are they recorded by the treatment program?
23          A.    No, sir.
24          Q.    What about access to the Internet and e-mails and that
25    kind of thing?
```

 1          A.    None of that.

 2          Q.    Can they have their own cell phones with them?

 3          A.    No, sir.

 4          Q.    Okay.  During the application process for Mr. Durham, did

 5     you or anyone else at Healing Transitions have the opportunity to

 6     review records from Mr. Durham from any of his prior treatment

 7     programs?

 8          A.    No, sir.

 9          Q.    Did you or anyone else at Healing Transitions question

10     Mr. Durham about his prior treatment programs?

11          A.    No, sir.  We ask him about his prior consistency of drugs

12     and alcohol.  Substance use.

13          Q.    Okay.  And so you're not aware of the reasons why he was

14     not successful in the prior treatment program?

15          A.    I am not.

16          Q.    Okay.  Does Healing Transitions provide transportation to

17     court appearance?

18          A.    They can take public transportation if they needed to.

19          Q.    Okay.  But the program doesn't itself provide transport

20     to and from court appearances?

21          A.    No, sir.

22          Q.    And if they have to take public transportation to go to

23     court, there's no staff member that goes along with them to

24     supervise?

25          A.    No, sir.

1          Q.    All right.  You talked a little bit before about your
2    familiarity with Mr. Durham's criminal history.  Did that
3    information come to you from the defense counsel?
4          A.    Yes, sir.
5          Q.    Did you all discuss the circumstances surrounding Mr.
6    Durham's instant case, the reason why we're in federal court today?
7          A.    Yes, sir.
8          Q.    You're aware that he is -- it's alleged he possessed a
9    firearm during a traffic stop?
10         A.    Yes, sir.
11         Q.    And you're also aware that he -- it's alleged that he had
12   an amount of methamphetamine with him during that stop?
13         A.    Yes, sir.
14         Q.    And ammunition?
15         A.    Yes, sir.
16         Q.    And drug paraphernalia?
17         A.    Yes, sir.
18         Q.    And you're aware of his prior lack of compliance with
19   court-ordered supervision?
20         A.    Yes, sir.
21         Q.    Including absconding from supervision?
22         A.    Yes, sir.
23         Q.    And committing new criminal conduct while under
24   supervision?
25         A.    Yes, sir.  And if I may, all those things sound like

1    decisions that are made with somebody who is in an addiction with

2    drugs.

3         Q.    Thank you, ma'am.

4         A.    Yes, sir.

5              MR. DODSON:  I have nothing further.

6              THE COURT:  Anything else, Mr. Wicclair?

7              MR. WICCLAIR:  Very briefly.

8                        **CROSS-EXAMINATION**

9    BY MR. WICCLAIR:

10        Q.    Ms. Elk, Mr. Dodson asked you about your knowledge of Mr.

11   Durham's prior failures with drug treatment programs.

12        A.    Yes, sir.

13        Q.    Does the fact that he has not been successful with, I

14   guess what would be considered outpatient treatment, does that give

15   you pause as to his ability to succeed in this program?

16        A.    It does not.  Because being in outpatient treatment,

17   you're still in your surroundings.  You're still in the same place

18   that you were making these bad decisions and unable to maintain a

19   successful life.  So being removed from that area and put into a

20   residential program and being around other people who are

21   experiencing the exact same thing that you're experiencing is --

22   shows more success.

23        Q.    And along those lines, have you seen people who have been

24   unsuccessful in prior treatment programs succeed in Healing

25   Transitions?

```
 1          A.    I have.  Yes, sir.

 2                MR. WICCLAIR:  I don't have anything further.

 3                THE COURT:  Thank you.

 4                Anything else, Mr. Dodson?

 5                MR. DODSON:  No, your Honor.

 6                THE COURT:  Thank you, ma'am.  Please watch your step

 7     stepping down.

 8                          (Witness Excused)

 9                THE COURT:  Any other evidence from the defense?

10                MR. WICCLAIR:  Your Honor, I would just submit -- if I

11     could just submit Defense Exhibit 3, which is a Healing Transitions

12     brochure, frequently asked questions.  I've provided counsel with a

13     copy.

14                If I may approach.

15                THE COURT:  You may.

16          (Attorney Wicclair providing exhibits to the deputy clerk)

17                THE COURT:  Thank you.

18                MR. WICCLAIR:  I would ask, in addition to Exhibit 3,

19     that Exhibit 2 from the motion that I filed be entered into evidence

20     as well.  The letter of acceptance from Healing Transitions.

21                THE COURT:  It will be received.

22          (Defendant's Exhibit Nos. 2 and 3 received into evidence)

23                MR. WICCLAIR:  I have no further evidence.

24                THE COURT:  Evidence from the United States?

25                MR. DODSON:  Your Honor, we have the case agent here from
```

**DURHAM APPENDIX 77**

20

```
1    Wilson Police Department, Detective James Holmes, who can provide

2    testimony about the evidence in the case.

3              THE COURT:  All right.  Thank you.

4              THE CLERK:  Please place your left hand on the Bible and

5    raise your right.  Please state your name.

6              THE WITNESS:  James Holmes.

7                     DETECTIVE JAMES HOLMES

8              having been duly sworn, testified as follows:

9              THE WITNESS:  I do.

10             THE CLERK:  Thank you.

11             Would you like water?

12             THE WITNESS:  No, thank you.

13             THE COURT:  You may examine the witness.

14             MR. DODSON:  Thank you, your Honor.

15                     DIRECT EXAMINATION

16   BY MR. DODSON:

17        Q.   Sir, could you introduce yourself to the Court, tell him

18   where do you work and what are your duties and responsibilities.

19        A.   Detective James Holmes with the Wilson Police Department.

20   I work in the vice narcotics unit.  We handle our narcotics cases

21   along with firearm cases that are received through the police

22   department.

23        Q.   In that capacity, you're familiar with the case involving

24   Mr. Frankie Allan Durham?

25        A.   Yes, sir.
```

1      Q.   Did he make contact with the Wilson Police Department on

2  November the 5th of 2020?

3      A.   Yes, sir.

4      Q.   Can you tell the Court the nature of that contact.

5      A.   Officer Demarst had observed Mr. --

6           THE COURT REPORTER:  Could you spell the last name,

7  please.

8           THE WITNESS:  Demarst, D-E-M-A-R-S-T.

9           THE COURT REPORTER:  Thank you.

10     A.   -- observed Mr. Durham's vehicle traveling in the area of

11 Delano Ave.  Failed to use a turn signal.  And when he ran the

12 license plate to see if it was active, it came back lost or stolen.

13          During that stop, he went ahead and made contact with Mr.

14 Durham.  Mr. Durham was asking him why he stopped him.  He told him

15 it was due to the plates.  He stated that those were his plates.

16          Officer Demarst got Mr. Durham's information and went

17 back to the patrol car and started running the information to see if

18 his license was good.  See if he had any warrants or if he was on

19 probation.  It showed he was on probation for a narcotics-related

20 offense.

21          Officer Demarst had called a canine due to Mr. Durham

22 being nervous and him being on probation with that drug offense.

23 When the dog got there, they had Mr. Durham step out of the vehicle

24 because our canines don't conduct sniffs without -- or with someone

25 in the vehicle for safety reasons.  The canine did not alert, but

1    Officer Demarst was able to observe, in plain view, a glass pipe

2    that was sitting on the driver's seat.

3         Due to the glass pipe, they went ahead and conducted a

4    probable cause search of the vehicle.  Underneath the driver's seat

5    they located the firearm with an extended mag beside it.  They also

6    located on the floor board some methamphetamine.  That was

7    approximately 3 grams.  And then in the glove box they located

8    ammunition, baggies and a scale.

9         Q.    And was this interaction with Mr. Durham captured on

10   Officer Demarst's dash camera and his body-worn camera?

11        A.    Yes, sir.

12        Q.    And the firearm that is was recovered, was that a 9mm

13   handgun?

14        A.    It was an SCCY 9mm.

15        Q.    You said it had an extended mag.  You mean an extended

16   magazine?

17        A.    Yes, sir.

18        Q.    And was that loaded with ammunition?

19        A.    It was.

20        Q.    And Mr. Durham was placed under arrest and charged with

21   various state offenses; is that correct?

22        A.    Correct.

23        Q.    Did law enforcement have an opportunity to interview Mr.

24   Durham upon his arrest?

25        A.    They did.

1          Q.    Was he Mirandized?

2          A.    He was.

3          Q.    What did he say, if anything, with regard to the firearm

4    found in the vehicle?

5          A.    During the interview, he denied anything to do with the

6    firearm or the methamphetamine.  Said it wasn't his.  Wasn't his

7    vehicle.

8                When Detective Seagroves asked him about if there would

9    be any DNA or fingerprints on the firearm, he made a comment that he

10   did move the firearm because he had seen it in the glove box and he

11   had moved it under the seat.  That was prior to any interaction with

12   law enforcement.

13         Q.    And this interview with Mr. Durham, was that audio and

14   video recorded?

15         A.    Yes, sir.

16         Q.    And the firearm that was retrieved, was that submitted to

17   ATF for an interstate nexus examination?

18         A.    Yes, sir.  It was sent to ATF Agent Collin Kilpatrick.

19         Q.    And what were the results?

20         A.    That it did affect interstate commerce.

21         Q.    Thank you, Detective Holmes.

22               MR. AVERITT:  Nothing further, your Honor.

23               THE COURT:  Cross-examination.

24               MR. WICCLAIR:  Thank you, your Honor.

25   ///

1                          **CROSS-EXAMINATION**

2    BY MR. WICCLAIR:

3         Q.    Good morning, Detective.

4         A.    Good morning.

5         Q.    Detective, you stated that there was a car stop for

6    these, I guess, bad registration, right?

7         A.    The plates came back lost or stolen, yes, sir.

8         Q.    And as far as you know, when lights and sirens were

9    placed -- when lights and sirens went on, Mr. Durham immediately

10   pulled over the car, correct?

11        A.    He did pull over, correct.

12        Q.    Okay.  And Mr. Durham signed a consent form to allow for

13   a buccal swab to be taken from him?

14        A.    Yes, sir.

15        Q.    And this was so that there could be a comparison done to

16   any DNA that could be recovered from the firearm, right?

17        A.    Correct.

18        Q.    Are you aware if any DNA analysis was done?

19        A.    I am not, but I am aware that right now the SBI is not

20   taking many of our firearms' buccal swabs due to the increase in

21   homicides and sexual assault cases.

22        Q.    Are you aware if it was submitted to the lab in this

23   case?

24        A.    I'm not aware.

25        Q.    Okay.  Similar, fingerprints, not aware?

```
 1        A.    Fingerprints, it would have been processed by our
 2   forensic analysis -- or analyst, I'm sorry.
 3        Q.    And do you know if it was submitted and any results
 4   were --
 5        A.    I don't believe any results came back on that.
 6        Q.    Okay.  You also said Mr. Durham was cooperative with
 7   detectives by waiving Miranda.
 8        A.    He waived his rights, yes, sir.
 9        Q.    Okay.  And he told you that the truck belonged to a Ms.
10   Leslie Davis, correct?
11        A.    Correct.
12        Q.    Did you or any officers determine who the truck was
13   registered to?
14        A.    I'll have to look back at my notes to see if they had it.
15   (Reviewing documents).  In here it did not have a name associated
16   with the tag -- or the vehicle.
17        Q.    Are you aware of whether it was registered to another
18   individual other than Mr. Durham?
19        A.    I'm not aware, but I believe that was the case.
20        Q.    Okay.  Do you know if officers ever spoke with Ms. Davis?
21        A.    I don't believe so.
22        Q.    I want to ask you briefly about the glass pipe that you
23   mentioned.  You said that the probable cause search was based off of
24   this glass pipe that was observed in plain view, right?
25        A.    Yes, sir.
```

```
 1          Q.    And Officer Demarst, he saw this after he had Mr. Durham
 2    step out of the vehicle?
 3          A.    Correct.
 4          Q.    And, I mean, this -- I know there were some pictures of
 5    this glass pipe in discovery.  That is glass pipe that could be used
 6    to --
 7          A.    Smoke --
 8          Q.    -- imbibe a number of substances, right?
 9          A.    Um-hum.
10          Q.    Including tobacco, right?
11          A.    Methamphetamine.
12          Q.    I mean, meth but also tobacco, correct?
13          A.    They're usually set up a little bit different.
14          Q.    Okay.  But I guess it's possible to smoke different
15    substances other than meth, correct?
16          A.    It's possible, but there was also meth in the vehicle.
17    So two and two go along with each other.
18          Q.    Now the meth in the vehicle, that was recovered incident
19    to the probable cause search, right?
20          A.    Yes, sir.
21          Q.    Okay.
22                MR. WICCLAIR:  I don't have any further questions.  Thank
23    you, your Honor.
24                THE COURT:  Mr. Dodson.
25                MR. DODSON:  Just very briefly, Judge.
```

| | |
|---|---|
| 1 | **<u>REDIRECT EXAMINATION</u>** |
| 2 | BY MR. DODSON: |
| 3 |     Q.   This glass pipe was found -- Mr. Durham was sitting on |
| 4 | the pipe, correct? |
| 5 |     A.   Correct. |
| 6 |     Q.   So when he stood up, that's when the officer found it, |
| 7 | right where he had been sitting? |
| 8 |     A.   Correct. |
| 9 |     Q.   Thank you. |
| 10 |         MR. DODSON:  Nothing further, your Honor. |
| 11 |         THE COURT:  Thank you. |
| 12 |         Thank you.  Watch your step stepping down. |
| 13 |         THE WITNESS:  Yes, sir. |
| 14 |                 (Witness Excused) |
| 15 |         THE COURT:  All right.  Any other evidence from the |
| 16 | Government? |
| 17 |         MR. DODSON:  No, your Honor. |
| 18 |         THE COURT:  I'll briefly hear argument. |
| 19 |         Mr. Wicclair. |
| 20 |         MR. WICCLAIR:  Yes, your Honor. |
| 21 |         Your Honor, we would ask that your Honor release Mr. |
| 22 | Durham to reside at Healing Transitions.  We would ask that you put |
| 23 | in place any conditions that you believe are necessary, but we would |
| 24 | ask you to put in place a condition of electronic monitoring.  And |
| 25 | we would also ask that you place a condition that Mr. Durham, upon |

1    entering the facility, sign a release form allowing the treatment

2    facility to communicate with United States Probation.

3           We believe that these conditions, as well as any

4    conditions that your Honor sees fit, would ensure that Mr. Durham is

5    neither a flight risk nor a safety risk.  And if I could get into

6    each one of those factors, your Honor.

7           Your Honor, with regard to the risk of flight, you know,

8    the Government alluded to the fact that there is -- there was a

9    history of absconding.  However, other than that absconding, which

10   occurred in 2017, the only FTAs are for minor traffic offenses.  And

11   this absconding from probation occurred, unsurprisingly, the same

12   time that Mr. Durham -- or in proximity to Mr. Durham testing

13   positive for narcotics.

14          We -- I would submit, your Honor, that after he was

15   violated for absconding, he was placed on post-release supervision

16   and he did complete the nine-month period of supervised release.

17   And we would submit, your Honor, that if he is placed in this

18   Healing Transitions program, which would get at the heart of what is

19   causing him to abscond and also break the law, that this would

20   ensure that he is not a flight risk, especially if placed on

21   electronic monitoring because he would be apprehended immediately

22   and he knows that.

23          Your Honor, with regard to danger to the community, you

24   know, I've said this at the outset, his record is that of a drug

25   addict, you know.  I'm not saying that that minimizes the fact that

1    he has property and drug-related offenses which burden the

2    community, but, your Honor, what I am saying is that we see from a

3    history, before he began to use narcotics, that he was capable of

4    being an upstanding citizen.  Up until 27 he had never been

5    arrested.  He was married.  He had a daughter.  He worked full time

6    at a country club.  This was a person who otherwise was living an

7    upstanding life.  We know he can be that person.  We know what's

8    causing him to stray from being that person and it's drug use.

9            Your Honor, we would submit that with this plan in place,

10   which is an intensive treatment program, that he can become that

11   person again; and we would submit that, your Honor, this is, in

12   fact, the least restrictive means to accomplish that goal.

13           Thank you, your Honor.

14           THE COURT:  Thank you.

15           Mr. Dodson.

16           MR. DODSON:  Thank you, your Honor.

17           Very briefly.  Mr. Durham is a three-time convicted felon

18   for serious drug charges.  Each one of those convictions followed

19   probation violations that we've discussed here today.

20           It appears that he has never been successful on

21   supervision.  He has very serious violations of supervision and they

22   are very recent.  And had we just had a situation where we're

23   talking about drugs, that's one thing, but now we've -- Mr. Durham

24   has ratcheted it up not only to drugs but to a firearm with an

25   extended magazine, driving around the streets of Wilson, a place

1    where guns and drugs are a problem in this district.

2         And he -- that's one of the more serious concerns that

3    the Government has in this case is that he does have a firearm.

4    It's not only drugs that he had on his person, but each one of his

5    felony convictions again followed probation violations.  He has

6    three prior misdemeanor convictions for drugs and two of those

7    misdemeanors were pled down from felonies.

8         He has a very concerning history in a very short amount

9    of time and it appears, at least to me in review of the pretrial

10   services report, that, again, it is ratcheting now up to possessing

11   a firearm with an extended magazine.

12        There's -- Healing Transitions is a wonderful program,

13   your Honor.  I think it sounds like it provides a really good

14   service.  And I think that Mr. -- there's no doubt Mr. Durham can

15   benefit from some treatment.  But the question here is safety to the

16   community or risk of non-appearance.  And the Government would

17   submit to this Court that Mr. Durham is a significant risk to the

18   community.  The program is set up -- how it's set up does not --

19   again, it's not a dig towards the program, it -- but when you take

20   the program and apply it to Mr. Durham's case, it does not mitigate

21   his risk of danger to the community in this case.

22        Very serious drugs.  Methamphetamine, heroin and now a

23   firearm.  And the very fact he has absconding -- an absconding

24   history and a history of failing to complete substance abuse

25   treatment programs demonstrates that there's a high likelihood that

```
 1   he would do the same again in this case.

 2           We would ask that you deny the defense motion for

 3   release.

 4           THE COURT:  Thank you.

 5           Anything else, Mr. Wicclair?

 6           MR. WICCLAIR:  No.  Thank you, your Honor.

 7           THE COURT:  All right.  Mr. Durham, the Court has

 8   considered all the evidence presented during the hearing.  Under the

 9   Bail Reform Act, I'm to consider a number of factors.

10           The Government seeks your continued detention because the

11   Government asserts you're a serious risk of flight and a danger to

12   the community.

13           The factors under 18 U.S.C., Section 3142(g) that I am to

14   consider include the nature and circumstances of the offense

15   charged, including whether the offense is a crime of violence or

16   involves a narcotic drug.  The offense charged itself does not

17   involve a crime of violence or involve a narcotic drug.  Obviously,

18   the relevant conduct does involve issues associated with alleged

19   possession of methamphetamine, including a pipe that you were

20   sitting on.

21           As for the weight of the evidence against you, the

22   officer recounted it, including an admission to moving the firearm

23   from the glove box to the -- under the seat, which if credited by a

24   fact finder, would be a strong piece of evidence against you in

25   terms of considering the weight of the evidence against you, even if
```

1  it's not your truck.  Obviously ownership of the truck and ownership

2  of the gun are not elements of the offense of being a felon in

3  possession of a firearm.  So the weight of the evidence does seem to

4  me to be strong.

5        As for your history and characteristics, I'm to consider

6  the character, physical and mental condition of the defendant,

7  family ties, employment, community ties, history related to drug and

8  alcohol abuse, criminal history, record concerning court

9  appearances.  Whether at the time of the offense you were on

10 probation, parole or other release.  The nature and seriousness of

11 the danger to another person or the community posed by the

12 defendant's release.

13       Here, looking at the character, physical and mental

14 condition, I certainly understand your lawyer's argument associated

15 with your drug history.  You certainly have a robust history of

16 illegally using drugs and a robust criminal history.

17       Your family ties -- the report indicates you're divorced,

18 you have a daughter.  You had been employed working at a golf

19 course.  Apparently had lost that job, according to the report.  You

20 obviously have a lengthy history associated with illegally using

21 substances.

22       Your criminal history began at age 27.  Simple worthless

23 check, possession of heroin.  You got a probationary sentence for

24 that.  Your probation was revoked.  Released to post-release

25 supervision.  You violated the conditions of probation by absconding

1   from supervision; failing to satisfy court fees; testing positive

2   for drug use; and failing to complete community service.  You

3   violated the conditions of post-release supervision by testing

4   positive for drug use and failure to satisfy court fees.

5           Conviction for possession of drug paraphernalia.  Three

6   of those in succession in ages 28, 29 and 30.  A larceny conviction

7   at age 30.  Felony possession with intent to manufacture, sell or

8   deliver a controlled substance in Wayne County Superior Court at age

9   31.  You were placed on probation for that.

10           You were on probation at the time of the events alleged

11  in the indictment, which is another factor to consider, whether at

12  the time of the offense the person was on probation, parole or other

13  release.  It obviously is a condition of probation to not violate

14  the law and that would include not possessing a firearm as a felon,

15  not possessing or using methamphetamine.

16           You have a conviction of possession with intent to

17  manufacture, sell or deliver controlled substance that's recounted

18  in the report.  You violated the conditions of post-release

19  supervision by testing positive for drug use, committing new

20  criminal conduct, failing to comply with substance abuse treatment,

21  failing to satisfy court fees.

22           You also have a record of failures to appear reflected in

23  the bail report at Docket Entry 15 in connection with charges that

24  were filed in 2018 based on the docket number as well as failures to

25  appear in Nash County in the same time period.

1          I have considered the testimony of Ms. Elk in the

2    program.  Fundamentally, it's -- I would have to have trust in you

3    and based on the record that I have in front of me, I don't.  Not a

4    reflection on Ms. Elk or the program that she helps to run.  It's a

5    question of whether I have confidence in your willingness actually

6    to comply and do what I say as a judge because you've stood in front

7    of other judges and have failed to do that.

8          That's a significant data point for me in thinking about

9    the topic of whether you're a serious risk of flight, a danger to

10   the community and whether there is a combination of conditions that

11   I could impose that would reasonably assure that you will appear and

12   will reasonably assure the safety of the community.

13         I do think based on the evidence presented, the

14   Government has met its burden that there is no combination of

15   conditions that I could impose that will reasonably assure your

16   appearance or prevent a serious risk that you'll endanger the safety

17   of another person or a community.  Thus, you will be remanded.

18         In making that finding, the Court does note that it's

19   ultimately a nonbinding system.  Even somebody on electronic

20   monitoring can walk away.  I do think there's an escalation

21   component of not just drugs, but having a gun, particularly one with

22   a magazine that's referenced.

23         Again, it's not a topic of ownership, but you certainly,

24   based on your own admission, possessed it when you moved it from the

25   glove box to under your seat.  You had the pipe under where you were

```
 1   sitting.
 2              So having fully considered the record, you'll be
 3   remanded.  You will continue to have access to consult with Mr.
 4   Wicclair as you prepare for the rest of the proceedings in
 5   connection with your case.
 6              I do thank counsel for their work in connection with the
 7   case.
 8              Anything else, Mr. Wicclair?
 9              MR. WICCLAIR:  No, that's it.  Thank you.
10              THE COURT:  Anything else, Mr. Dodson?
11              MR. DODSON:  No, your Honor.  Thank you.
12              THE COURT:  We'll be in recess until 1 o'clock.
13
14
15
16              (Hearing concluding at 12:13 p.m.)
17
18
19
20
21
22
23
24
25
```

```
 1                    UNITED STATES DISTRICT COURT

 2                  EASTERN DISTRICT OF NORTH CAROLINA

 3

 4                   CERTIFICATE OF OFFICIAL REPORTER

 5

 6            I, Michelle A. McGirr, RPR, CRR, CRC, Federal

 7   Official Court Reporter, in and for the United States District Court

 8   for the Eastern District of North Carolina, do hereby certify that

 9   pursuant to Section 753, Title 28, United States Code, that the

10   foregoing is a true and accurate transcript of my stenographically

11   reported proceedings held in the above-entitled matter and that the

12   transcript page format is in conformance with the regulations of the

13   Judicial Conference of the United States.

14

15   Dated this 17th day of August, 2021

16

17                            /s/  Michelle A. McGirr
                              MICHELLE A. McGIRR
18                            RPR, CRR, CRC, RMR
                              U.S. Official Court Reporter
19

20

21

22

23

24

25
```

DURHAM APPENDIX 94

<u>AO 472  (Rev. 09/08)  Detention Order Pending Trial</u>

# UNITED STATES DISTRICT COURT

for the

Eastern District of North Carolina

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| **FRANKIE ALLEN DURHAM,** | ) | Case No.    5:21-CR-229-D |
| | ) | |
| *Defendant* | ) | |

## DETENTION ORDER PENDING TRIAL

After conducting a detention hearing under the Bail Reform Act, 18 U.S.C. § 3142(f), I conclude that these facts require that the defendant be detained pending trial.

### Part I—Findings of Fact

(1)  The defendant is charged with an offense described in 18 U.S.C. § 3142(f)(1) and has previously been convicted of  ☐ a federal offense   ☐ a state or local offense that would have been a federal offense if federal jurisdiction had existed  -  that is

    ☐ a crime of violence as defined in 18 U.S.C. § 3156(a)(4)or an offense listed in 18 U.S.C. § 2332b(g)(5) for which the prison term is 10 years or more.

    ☐ an offense for which the maximum sentence is death or life imprisonment.

    ☐ an offense for which a maximum prison term of ten years or more is prescribed in _____

    _____ .*

    ☐ a felony committed after the defendant had been convicted of two or more prior federal offenses described in 18 U.S.C. § 3142(f)(1)(A)-(C), or comparable state or local offenses:

    ☐ any felony that is not a crime of violence but involves:

        ☐ a minor victim

        ☐ the possession or use of a firearm or destructive device or any other dangerous weapon

        ☐ a failure to register under 18 U.S.C. § 2250

☐ (2)  The offense described in finding (1) was committed while the defendant was on release pending trial for a federal, state release or local offense.

☐ (3)  A period of less than five years has elapsed since the  ☐ date of conviction   ☐ the defendant's release from prison for the offense described in finding (1).

☐ (4)  Findings Nos. (1), (2) and (3) establish a rebuttable presumption that no condition  will reasonably assure the safety of another  person or  the community.  I further find that the defendant has not rebutted this presumption.

### Alternative Findings (A)

☐ (1)  There is probable cause to believe that the defendant has committed an offense

    ☐ for which a maximum prison term of ten years or more is prescribed in _____ .

    ☐ under 18 U.S.C. § 924(c).

*Insert as applicable: (a) Controlled Substances Act (21 U.S.C. § 801 *et seq*.); (b) Controlled Substances Import and Export Act (21 U.S.C. § 951 *et seq*.); or (c) Section 1 of Act of Sept. 15, 1980 (21 U.S.C. § 955a).

AO 472  (Rev. 09/08)  Detention Order Pending Trial

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of North Carolina

(2)    The defendant has not rebutted the presumption established by finding 1 that no condition will reasonably assure the defendant's appearance and the safety of the community.

### Alternative Findings (B)

**X** (1)    There is a serious risk that the defendant will not appear.

**X** (2)    There is a serious risk that the defendant will endanger the safety of another person or the community.

### Part II— Statement of the Reasons for Detention

I find that the testimony and information submitted at the detention hearing establishes by  ☐ clear and convincing evidence  ☐ a preponderance of the evidence that

that the government has met its burden of proof under the standard applicable to each.  See, e.g., United States v. Simms, 128 F. App'x 314, 315 (4th Cir. 2005) (per curiam) (unpublished); United States v. Stewart, 19 F. App'x 46, 48–49 (4th Cir. 2001) (per curiam) (unpublished).  Defendant is a serious risk of danger to the community and a serious risk of flight, and no condition or combination of conditions will reasonably assure the safety of the community or the appearance of the defendant.  The court incorporates by reference its discussion in open court on August 2, 2021, of the factors under 18 U.S.C. § 3142(g).

### Part III—Directions Regarding Detention

The defendant is committed to the custody of the Attorney General or a designated representative for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or held in custody pending appeal.  The defendant must be afforded a reasonable opportunity to consult privately with defense counsel.  On order of United States Court or on request of an attorney for the Government, the person in charge of the corrections facility must deliver the defendant to the United States marshal for a court appearance.

Date:    August 2, 2021

_____
*Judge's Signature*

James C. Dever III, United States District Judge
*Name and Title*

*Insert as applicable:  (a) Controlled Substances Act (21 U.S.C. § 801 *et seq.*); (b) Controlled Substances Import and Export Act (21 U.S.C. § 951 *et seq.*); or (c) Section 1 of Act of Sept. 15, 1980 (21 U.S.C. § 955a).

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN  DIVISION

NO.  5:21-CR-229-D

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | NOTICE OF APPEAL |
| FRANKIE ALLAN DURHAM | |

Pursuant to 18 U.S.C. § 3145(c) and  Federal Rule of Appellate Procedure 4(b), the

Defendant, Frankie Allan Durham, hereby appeals to the United States Court of Appeals for the

Fourth Circuit from the order entered in this case on August 2, 2021 (DE22), which denied Mr.

Durham's motion for release on bond.

Respectfully requested this 16th day of August, 2021.

G. ALAN DUBOIS
Federal Public Defender

/s/ David E. Wicclair
DAVID E. WICCLAIR
Assistant Federal Public Defender
Attorney for Defendant
Office of the Federal Public Defender
150 Fayetteville Street, Suite 450
Raleigh, North Carolina 27601
Telephone: 919-856-4236
Fax: 919-856-4477
E-mail: David_Wicclair@fd.org
N.C. State Bar No. 50384
LR 57.1 Counsel Appointed

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served upon:

AAKASH SINGH
Assistant United States Attorney
Criminal Division
U.S. Attorney's Office, EDNC
150 Fayetteville St., Suite 2100
Raleigh, North Carolina 27601
E-mail: Aakash.Singh@usdoj.gov
Telephone: 919-856-4530
Fax: 919-856-4006

by electronically filing the foregoing with the Clerk of Court on August 16, 2021, using the

CM/ECF system which will send notification of such filing to the above.

This the 16th day of August, 2021.

/s/ David E. Wicclair
DAVID E. WICCLAIR
Assistant Federal Public Defender
Attorney for Defendant
Office of the Federal Public Defender
150 Fayetteville Street, Suite 450
Raleigh, North Carolina 27601
Telephone: 919-856-4236
Fax: 919-856-4477
E-mail: David_Wicclair@fd.org
N.C. State Bar No. 50384
LR 57.1 Counsel Appointed